## BRANZBURG *v.* HAYES ET AL., JUDGES

No. 70–85.   Argued February 23, 1972—Decided June 29, 1972*

WHITE, J., wrote the opinion of the Court, in which BURGER, C. J., and BLACKMUN, POWELL, and REHNQUIST, JJ., joined. POWELL, J., filed a concurring opinion, *post,* p. 709. DOUGLAS, J., filed a dissenting opinion, *post,* p. 711. STEWART, J., filed a dissenting opinion, in which BRENNAN and MARSHALL, JJ., joined, *post,* p. 725.

*Edgar A. Zingman* argued the cause for petitioner in No. 70–85.   With him on the briefs was *Robert C. Ewald.* *E. Barrett Prettyman, Jr.,* argued the cause for petitioner in No. 70–94.   With him on the briefs was *William H. Carey.*   Solicitor General *Griswold* argued the cause for the United States in No. 70–57.   With him on the briefs were *Assistant Attorney General Wilson, Assistant Attorney General Petersen, William Bradford Reynolds, Beatrice Rosenberg,* and *Sidney M. Glazer.*

---

*Together with No. 70–94, *In re Pappas,* on certiorari to the Supreme Judicial Court of Massachusetts, also argued February 23, 1972, and No. 70–57, *United States* v. *Caldwell,* on certiorari to the United States Court of Appeals for the Ninth Circuit, argued February 22, 1972.

*Edwin A. Schroering, Jr.,* argued the cause for respondents in No. 70–85. With him on the brief was *W. C. Fisher, Jr. Joseph J. Hurley,* First Assistant Attorney General, argued the cause for respondent, Commonwealth of Massachusetts, in No. 70–94. With him on the brief were *Robert H. Quinn,* Attorney General, *Walter H. Mayo III,* Assistant Attorney General, and *Lawrence T. Bench,* Deputy Assistant Attorney General. *Anthony G. Amsterdam* argued the cause for respondent in No. 70–57. With him on the brief were *Jack Greenberg, James M. Nabrit III, Charles Stephen Ralston,* and *William Bennett Turner.*

*William Bradford Reynolds* argued the cause for the United States as *amicus curiae* urging affirmance in Nos. 70–85 and 70–94. With him on the brief were *Solicitor General Griswold, Assistant Attorney General Wilson,* and *Beatrice Rosenberg.*

Briefs of *amici curiae* urging affirmance in No. 70–57 and reversal in Nos. 70–85 and 70–94 were filed by *Alexander M. Bickel, Lawrence J. McKay, Floyd Abrams, Daniel Sheehan, Corydon B. Dunham, Clarence J. Fried, Alan J. Hruska, Robert S. Rifkind, Anthony A. Dean,* and *Edward C. Wallace* for New York Times Co., Inc., et al.; by *Don H. Reuben, Lawrence Gunnels, Steven L. Bashwiner,* and *Thomas F. Ging* for Chicago Tribune Co.; by *Arthur B. Hanson* for the American Newspaper Publishers Association; and by *Irving Leuchter* for the American Newspaper Guild, AFL–CIO, CLC.

*John T. Corrigan* filed a brief for the National District Attorneys Association urging reversal in No. 70–57 and affirmance in No. 70–94.

Briefs of *amici curiae* urging affirmance in No. 70–57 were filed by *Irwin Karp* for the Authors League of America, Inc.; by *W. Theodore Pierson* and *J. Laurent*

*Scharff* for the Radio Television News Directors Association; and by *Earle K. Moore* and *Samuel Rabinove* for the Office of Communication of the United Church of Christ et al.

Briefs of *amici curiae* in No. 70–57 were filed by *Leo P. Larkin, Jr., Stanley Godofsky,* and *John J. Sheehy* for Washington Post Co. et al.; by *Richard M. Schmidt, Jr.,* for the American Society of Newspaper Editors et al.; by *Roger A. Clark* for the National Press Photographers Association, Inc.; and by *Melvin L. Wulf, Paul N. Halvonik, A. L. Wirin, Fred Okrand,* and *Lawrence R. Sperber* for the American Civil Liberties Union et al.

Opinion of the Court by MR. JUSTICE WHITE, announced by THE CHIEF JUSTICE.

The issue in these cases is whether requiring newsmen to appear and testify before state or federal grand juries abridges the freedom of speech and press guaranteed by the First Amendment. We hold that it does not.

I

The writ of certiorari in No. 70–85, *Branzburg* v. *Hayes* and *Meigs,* brings before us two judgments of the Kentucky Court of Appeals, both involving petitioner Branzburg, a staff reporter for the Courier-Journal, a daily newspaper published in Louisville, Kentucky.

On November 15, 1969, the Courier-Journal carried a story under petitioner's by-line describing in detail his observations of two young residents of Jefferson County synthesizing hashish from marihuana, an activity which, they asserted, earned them about $5,000 in three weeks. The article included a photograph of a pair of hands working above a laboratory table on which was a substance identified by the caption as hashish. The article stated that petitioner had promised not to

reveal the identity of the two hashish makers.[1] Petitioner was shortly subpoenaed by the Jefferson County grand jury; he appeared, but refused to identify the individuals he had seen possessing marihuana or the persons he had seen making hashish from marihuana.[2] A state trial court judge [3] ordered petitioner to answer these questions and rejected his contention that the Kentucky reporters' privilege statute, Ky. Rev. Stat. § 421.100 (1962),[4] the First Amendment of the United States Constitution, or §§ 1, 2, and 8 of the Kentucky Constitution authorized his refusal to answer. Petitioner then sought prohibition and mandamus in the Kentucky Court of Appeals on the same grounds, but the Court of Appeals denied the petition. *Branzburg* v.

---

[1] The article contained the following paragraph: " 'I don't know why I'm letting you do this story,' [one informant] said quietly. 'To make the narcs (narcotics detectives) mad, I guess. That's the main reason.' However, Larry and his partner asked for and received a promise that their names would be changed." App. 3-4.

[2] The Foreman of the grand jury reported that petitioner Branzburg had refused to answer the following two questions: "#1. On November 12, or 13, 1969, who was the person or persons you observed in possession of Marijuana, about which you wrote an article in the Courier-Journal on November 15, 1969? #2. On November 12, or 13, 1969, who was the person or persons you observed compounding Marijuana, producing same to a compound known as Hashish?" App. 6.

[3] Judge J. Miles Pound. The respondent in this case, Hon. John P. Hayes, is the successor of Judge Pound.

[4] Ky. Rev. Stat. § 421.100 provides:

"No person shall be compelled to disclose in any legal proceeding or trial before any court, or before any grand or petit jury, or before the presiding officer of any tribunal, or his agent or agents, or before the General Assembly, or any committee thereof, or before any city or county legislative body, or any committee thereof, or elsewhere, the source of any information procured or obtained by him, and published in a newspaper or by a radio or television broadcasting station by which he is engaged or employed, or with which he is connected."

*Pound,* 461 S. W. 2d 345 (1970), as modified on denial of rehearing, Jan. 22, 1971. It held that petitioner had abandoned his First Amendment argument in a supplemental memorandum he had filed and tacitly rejected his argument based on the Kentucky Constitution. It also construed Ky. Rev. Stat. § 421.100 as affording a newsman the privilege of refusing to divulge the identity of an informant who supplied him with information, but held that the statute did not permit a reporter to refuse to testify about events he had observed personally, including the identities of those persons he had observed.

The second case involving petitioner Branzburg arose out of his later story published on January 10, 1971, which described in detail the use of drugs in Frankfort, Kentucky. The article reported that in order to provide a comprehensive survey of the "drug scene" in Frankfort, petitioner had "spent two weeks interviewing several dozen drug users in the capital city" and had seen some of them smoking marihuana. A number of conversations with and observations of several unnamed drug users were recounted. Subpoenaed to appear before a Franklin County grand jury "to testify in the matter of violation of statutes concerning use and sale of drugs," petitioner Branzburg moved to quash the summons;[5] the motion was denied, al-

---

[5] Petitioner's Motion to Quash argued:

"If Mr. Branzburg were required to disclose these confidences to the Grand Jury, or any other person, he would thereby destroy the relationship of trust which he presently enjoys with those in the drug culture. They would refuse to speak to him; they would become even more reluctant than they are now to speak to any newsman; and the news media would thereby be vitally hampered in their ability to cover the views and activities of those involved in the drug culture.

"The inevitable effect of the subpoena issued to Mr. Branzburg, if it not be quashed by this Court, will be to suppress

though an order was issued protecting Branzburg from revealing "confidential associations, sources or information" but requiring that he "answer any questions which concern or pertain to any criminal act, the commission of which was actually observed by [him]." Prior to the time he was slated to appear before the grand jury, petitioner sought mandamus and prohibition from the Kentucky Court of Appeals, arguing that if he were forced to go before the grand jury or to answer questions regarding the identity of informants or disclose information given to him in confidence, his effectiveness as a reporter would be greatly damaged. The Court of Appeals once again denied the requested writs, reaffirming its construction of Ky. Rev. Stat. § 421.100, and rejecting petitioner's claim of a First Amendment privilege. It distinguished *Caldwell* v. *United States*, 434 F. 2d 1081 (CA9 1970), and it also announced its "misgivings" about that decision, asserting that it represented "a drastic departure from the generally recognized rule that the sources of information of a newspaper reporter are not privileged under the First Amendment." It characterized petitioner's fear that his ability to obtain

vital First Amendment freedoms of Mr. Branzburg, of the Courier-Journal, of the news media, and of those involved in the drug culture by driving a wedge of distrust and silence between the news media and the drug culture. This Court should not sanction a use of its process entailing so drastic an incursion upon First Amendment freedoms in the absence of compelling Commonwealth interest in requiring Mr. Branzburg's appearance before the Grand Jury. It is insufficient merely to protect Mr. Branzburg's right to silence after he appears before the Grand Jury. This Court should totally excuse Mr. Branzburg from responding to the subpoena and even entering the Grand Jury room. Once Mr. Branzburg is required to go behind the closed doors of the Grand Jury room, his effectiveness as a reporter in these areas is totally destroyed. The secrecy that surrounds Grand Jury testimony necessarily introduces uncertainties in the minds of those who fear a betrayal of their confidences." App. 43–44.

news would be destroyed as "so tenuous that it does not, in the opinion of this court, present an issue of abridgement of the freedom of the press within the meaning of that term as used in the Constitution of the United States."

Petitioner sought a writ of certiorari to review both judgments of the Kentucky Court of Appeals, and we granted the writ.[6]    402 U. S. 942 (1971).

---

[6] After the Kentucky Court of Appeals' decision in *Branzburg* v. *Meigs* was announced, petitioner filed a rehearing motion in *Branzburg* v. *Pound* suggesting that the court had not passed upon his First Amendment argument and calling to the court's attention the recent Ninth Circuit decision in *Caldwell* v. *United States,* 434 F. 2d 1081 (1970).  On Jan. 22, 1971, the court denied petitioner's motion and filed an amended opinion in the case, adding a footnote, 461 S. W. 2d 345, 346 n. 1, to indicate that petitioner had abandoned his First Amendment argument and elected to rely wholly on Ky. Rev. Stat. § 421.100 when he filed a Supplemental Memorandum before oral argument.  In his Petition for Prohibition and Mandamus, petitioner had clearly relied on the First Amendment, and he had filed his Supplemental Memorandum in response to the State's Memorandum in Opposition to the granting of the writs.  As its title indicates, this Memorandum was complementary to petitioner's earlier Petition, and it dealt primarily with the State's construction of the phrase "source of any information" in Ky. Rev. Stat. § 421.100.  The passage that the Kentucky Court of Appeals cited to indicate abandonment of petitioner's First Amendment claim is as follows:

"Thus, the controversy continues as to whether a newsman's source of information should be privileged.  However, that question is not before the Court in this case.  The Legislature of Kentucky has settled the issue, having decided that a newsman's source of information is to be privileged.  Because of this there is no point in citing Professor Wigmore and other authorities who speak against the grant of such a privilege.  The question has been many times debated, and the Legislature has spoken.  The only question before the Court is the construction of the term 'source of information' as it was intended by the Legislature."

Though the passage itself is somewhat unclear, the surrounding discussion indicates that petitioner was asserting here that the ques-

*In re Pappas*, No. 70–94, originated when petitioner Pappas, a television newsman-photographer working out of the Providence, Rhode Island, office of a New Bedford, Massachusetts, television station, was called to New Bedford on July 30, 1970, to report on civil disorders there which involved fires and other turmoil. He intended to cover a Black Panther news conference at that group's headquarters in a boarded-up store. Petitioner found the streets around the store barricaded, but he ultimately gained entrance to the area and recorded and photographed a prepared statement read by one of the Black Panther leaders at about 3 p. m.[7] He then asked for and received permission to re-enter the area. Returning at about 9 o' clock, he was allowed to enter and remain inside Panther headquarters. As a condition of entry, Pappas agreed not to disclose anything he saw or heard inside the store except an anticipated police raid, which Pappas, "on his own," was free to photograph and report as he wished. Pappas stayed inside the headquarters for about three hours, but there was no police raid, and petitioner wrote no story and did not otherwise reveal what had occurred in the store while he was there. Two months later, petitioner was summoned before the Bristol

---

tion of whether a common-law privilege should be recognized was irrelevant since the legislature had already enacted a statute. In his earlier discussion, petitioner had analyzed certain cases in which the First Amendment argument was made but indicated that it was not necessary to reach this question if the statutory phrase "source of any information" were interpreted expansively. We do not interpret this discussion as indicating that petitioner was abandoning his First Amendment claim if the Kentucky Court of Appeals did not agree with his statutory interpretation argument, and we hold that the constitutional question in *Branzburg* v. *Pound* was properly preserved for review.

[7] Petitioner's news films of this event were made available to the Bristol County District Attorney. App. 4.

County Grand Jury and appeared, answered questions as to his name, address, employment, and what he had seen and heard outside Panther headquarters, but refused to answer any questions about what had taken place inside headquarters while he was there, claiming that the First Amendment afforded him a privilege to protect confidential informants and their information. A second summons was then served upon him, again directing him to appear before the grand jury and "to give such evidence as he knows relating to any matters which may be inquired of on behalf of the Commonwealth before . . . the Grand Jury." His motion to quash on First Amendment and other grounds was denied by the trial judge who, noting the absence of a statutory newsman's privilege in Massachusetts, ruled that petitioner had no constitutional privilege to refuse to divulge to the grand jury what he had seen and heard, including the identity of persons he had observed. The case was reported for decision to the Supreme Judicial Court of Massachusetts.[8] The record there did not include a transcript of the hearing on the motion to quash, nor did it reveal the specific questions petitioner had refused to answer, the expected nature of his testimony, the nature of the grand jury investigation, or the likelihood of the grand jury's securing the information it sought from petitioner by other means.[9] The

---

[8] The case was reported by the superior court directly to the Supreme Judicial Court for an interlocutory ruling under Mass. Gen. Laws, c. 278, § 30A and Mass. Gen. Laws, c. 231, § 111 (1959). The Supreme Judicial Court's decision appears at 358 Mass. 604, 266 N. E. 2d 297 (1971).

[9] "We do not have before us the text of any specific questions which Pappas has refused to answer before the grand jury, or any petition to hold him for contempt for his refusal. We have only general statements concerning (a) the inquiries of the grand jury, and (b) the materiality of the testimony sought from Pappas. The record does not show the expected nature of his testimony or what

Supreme Judicial Court, however, took "judicial notice that in July, 1970, there were serious civil disorders in New Bedford, which involved street barricades, exclusion of the public from certain streets, fires, and similar turmoil. We were told at the arguments that there was gunfire in certain streets. We assume that the grand jury investigation was an appropriate effort to discover and indict those responsible for criminal acts." 358 Mass. 604, 607, 266 N. E. 2d 297, 299 (1971). The court then reaffirmed prior Massachusetts holdings that testimonial privileges were "exceptional" and "limited," stating that "[t]he principle that the public 'has a right to every man's evidence' " had usually been preferred, in the Commonwealth, to countervailing interests. *Ibid.* The court rejected the holding of the Ninth Circuit in *Caldwell* v. *United States, supra,* and "adhere[d] to the view that there exists no constitutional newsman's privilege, either qualified or absolute, to refuse to appear and testify before a court or grand jury." [10] 358 Mass., at 612, 266 N. E. 2d, at 302–303. Any adverse effect upon the free dissemination of news by virtue of petitioner's being called to testify was deemed to be only "indirect, theoretical, and uncertain." *Id.,* at 612, 266 N. E. 2d, at 302. The court concluded that "[t]he obligation of newsmen . . . is that of every citizen . . . to appear when summoned, with relevant written or other material when required, and to answer relevant and reasonable inquiries." *Id.,* at 612, 266 N. E. 2d, at 303. The court nevertheless noted that grand juries were subject to supervision by the presid-

---

likelihood there is of being able to obtain that testimony from persons other than news gatherers." 358 Mass., at 606–607, 266 N. E. 2d, at 299 (footnote omitted).

[10] The court expressly declined to consider, however, appearances of newsmen before legislative or administrative bodies. *Id.,* at 612 n. 10, 266 N. E. 2d, at 303 n. 10.

ing judge, who had the duty "to prevent oppressive, unnecessary, irrelevant, and other improper inquiry and investigation," *ibid.*, to insure that a witness' Fifth Amendment rights were not infringed, and to assess the propriety, necessity, and pertinence of the probable testimony to the investigation in progress.[11] The burden was deemed to be on the witness to establish the impropriety of the summons or the questions asked. The denial of the motion to quash was affirmed and we granted a writ of certiorari to petitioner Pappas. 402 U. S. 942 (1971).

*United States* v. *Caldwell*, No. 70–57, arose from subpoenas issued by a federal grand jury in the Northern District of California to respondent Earl Caldwell, a reporter for the New York Times assigned to cover the Black Panther Party and other black militant groups. A subpoena *duces tecum* was served on respondent on February 2, 1970, ordering him to appear before the grand jury to testify and to bring with him notes and tape recordings of interviews given him for publication by officers and spokesmen of the Black Panther Party concerning the aims, purposes, and activities of that organization.[12] Respondent objected to the scope

---

[11] The court noted that "a presiding judge may consider in his discretion" the argument that the use of newsmen as witnesses is likely to result in unnecessary or burdensome use of their work product, *id.*, at 614 n. 13, 266 N. E. 2d, at 304 n. 13, and cautioned that: "We do not suggest that a general investigation of mere political or group association of persons, without substantial relation to criminal events, may not be viewed by a judge in a somewhat different manner from an investigation of particular criminal events concerning which a newsman may have knowledge." *Id.*, at 614 n. 14, 266 N. E. 2d, at 304 n. 14.

[12] The subpoena ordered production of "[n]otes and tape recordings of interviews covering the period from January 1, 1969, to date, reflecting statements made for publication by officers and spokesmen for the Black Panther Party concerning the aims and purposes

of this subpoena, and an agreement between his counsel and the Government attorneys resulted in a continuance. A second subpoena, served on March 16, omitted the documentary requirement and simply ordered Caldwell "to appear . . . to testify before the Grand Jury." Respondent and his employer, the New York Times,[13] moved to quash on the ground that the unlimited breadth of the subpoenas and the fact that Caldwell would have to appear in secret before the grand jury would destroy his working relationship with the Black Panther Party and "suppress vital First Amendment freedoms . . . by driving a wedge of distrust and silence between the news media and the militants." App. 7. Respondent argued that "so drastic an incursion upon First Amendment freedoms" should not be permitted "in the absence of a compelling governmental interest—not shown here—in requiring Mr. Caldwell's appearance before the grand jury." *Ibid.* The motion was supported by *amicus curiae* memoranda from other publishing concerns and by affidavits from newsmen asserting the unfavorable impact on news sources of requiring reporters to appear before grand juries. The Government filed three memoranda in opposition to the motion to quash, each supported by affidavits. These documents stated that the grand jury was investigating, among other things, possible violations of a number of criminal statutes, including 18 U. S. C. § 871 (threats against the President), 18 U. S. C.

of said organization and the activities of said organization, its officers, staff, personnel, and members, including specifically but not limited to interviews given by David Hilliard and Raymond 'Masai' Hewitt." App. 20.

[13] The New York Times was granted standing to intervene as a party on the motion to quash the subpoenas. *Application of Caldwell,* 311 F. Supp. 358, 359 (ND Cal, 1970). It did not file an appeal from the District Court's contempt citation, and it did not seek certiorari here. It has filed an *amicus curiae* brief, however.

§ 1751 (assassination, attempts to assassinate, conspiracy to assassinate the President), 18 U. S. C. § 231 (civil disorders), 18 U. S. C. § 2101 (interstate travel to incite a riot), and 18 U. S. C. § 1341 (mail frauds and swindles). It was recited that on November 15, 1969, an officer of the Black Panther Party made a publicly televised speech in which he had declared that "[w]e will kill Richard Nixon" and that this threat had been repeated in three subsequent issues of the Party newspaper. App. 66, 77. Also referred to were various writings by Caldwell about the Black Panther Party, including an article published in the New York Times on December 14, 1969, stating that "[i]n their role as the vanguard in a revolutionary struggle the Panthers have picked up guns," and quoting the Chief of Staff of the Party as declaring: "We advocate the very direct overthrow of the Government by way of force and violence. By picking up guns and moving against it because we recognize it as being oppressive and in recognizing that we know that the only solution to it is armed struggle [sic]." App. 62. The Government also stated that the Chief of Staff of the Party had been indicted by the grand jury on December 3, 1969, for uttering threats against the life of the President in violation of 18 U. S. C. § 871 and that various efforts had been made to secure evidence of crimes under investigation through the immunization of persons allegedly associated with the Black Panther Party.

On April 6, the District Court denied the motion to quash, *Application of Caldwell*, 311 F. Supp. 358 (ND Cal. 1970), on the ground that *"every person* within the jurisdiction of the government" is bound to testify upon being properly summoned. *Id.*, at 360 (emphasis in original). Nevertheless, the court accepted respondent's First Amendment arguments to the extent of issuing a protective order providing that although respondent had to di-

vulge whatever information had been given to him for publication, he "shall not be required to reveal confidential associations, sources or information received, developed or maintained by him as a professional journalist in the course of his efforts to gather news for dissemination to the public through the press or other news media." The court held that the First Amendment afforded respondent a privilege to refuse disclosure of such confidential information until there had been "a showing by the Government of a compelling and overriding national interest in requiring Mr. Caldwell's testimony which cannot be served by any alternative means." *Id.,* at 362.

Subsequently,[14] the term of the grand jury expired, a new grand jury was convened, and a new subpoena *ad testificandum* was issued and served on May 22, 1970. A new motion to quash by respondent and memorandum in opposition by the Government were filed, and, by stipulation of the parties, the motion was submitted on the prior record. The court denied the motion to quash, repeating the protective provisions in its prior order but this time directing Caldwell to appear before the grand jury pursuant to the May 22 subpoena. Respondent refused to appear before the grand jury, and the court issued an order to show cause why he should not be held in contempt. Upon his further refusal to go before the grand jury, respondent was ordered committed for contempt until such time as he complied with the court's order or until the expiration of the term of the grand jury.

---

[14] Respondent appealed from the District Court's April 6 denial of his motion to quash on April 17, 1970, and the Government moved to dismiss that appeal on the ground that the order was interlocutory. On May 12, 1970, the Ninth Circuit dismissed the appeal without opinion.

Respondent Caldwell appealed the contempt order,[15] and the Court of Appeals reversed. *Caldwell* v. *United States,* 434 F. 2d 1081 (CA9 1970). Viewing the issue before it as whether Caldwell was required to appear before the grand jury at all, rather than the scope of permissible interrogation, the court first determined that the First Amendment provided a qualified testimonial privilege to newsmen; in its view, requiring a reporter like Caldwell to testify would deter his informants from communicating with him in the future and would cause him to censor his writings in an effort to avoid being subpoenaed. Absent compelling reasons for requiring his testimony, he was held privileged to withhold it. The court also held, for similar First Amendment reasons, that, absent some special showing of necessity by the Government, attendance by Caldwell at a secret meeting of the grand jury was something he was privileged to refuse because of the potential impact of such an appearance on the flow of news to the public. We granted the United States' petition for certiorari.[16] 402 U. S. 942 (1971).

## II

Petitioners Branzburg and Pappas and respondent Caldwell press First Amendment claims that may be simply put: that to gather news it is often necessary to agree either not to identify the source of information published or to publish only part of the facts revealed, or both; that if the reporter is nevertheless

---

[15] The Government did not file a cross-appeal and did not challenge the validity of the District Court protective order in the Court of Appeals.

[16] The petition presented a single question: "Whether a newspaper reporter who has published articles about an organization can, under the First Amendment, properly refuse to appear before a grand jury investigating possible crimes by members of that organization who have been quoted in the published articles."

forced to reveal these confidences to a grand jury, the source so identified and other confidential sources of other reporters will be measurably deterred from furnishing publishable information, all to the detriment of the free flow of information protected by the First Amendment. Although the newsmen in these cases do not claim an absolute privilege against official interrogation in all circumstances, they assert that the reporter should not be forced either to appear or to testify before a grand jury or at trial until and unless sufficient grounds are shown for believing that the reporter possesses information relevant to a crime the grand jury is investigating, that the information the reporter has is unavailable from other sources, and that the need for the information is sufficiently compelling to override the claimed invasion of First Amendment interests occasioned by the disclosure. Principally relied upon are prior cases emphasizing the importance of the First Amendment guarantees to individual development and to our system of representative government,[17] decisions requiring that official action with adverse impact on First Amendment rights be justified by a public interest that is "compelling" or "paramount," [18] and those precedents establishing the principle that justifiable governmental goals may not be achieved by unduly broad means having an unnecessary impact

---

[17] *Curtis Publishing Co.* v. *Butts,* 388 U. S. 130, 145 (1967) (opinion of Harlan, J.) ; *New York Times Co.* v. *Sullivan,* 376 U. S. 254, 270 (1964) ; *Talley* v. *California,* 362 U. S. 60, 64–65 (1960) ; *Bridges* v. *California,* 314 U. S. 252, 263 (1941) ; *Grosjean* v. *American Press Co.,* 297 U. S. 233, 250 (1936) ; *Near* v. *Minnesota,* 283 U. S. 697, 722 (1931).

[18] *NAACP* v. *Button,* 371 U. S. 415, 439 (1963) ; *Thomas* v. *Collins,* 323 U. S. 516, 530 (1945) ; *DeGregory* v. *Attorney General of New Hampshire,* 383 U. S. 825, 829 (1966) ; *Bates* v. *Little Rock,* 361 U. S. 516, 524 (1960) ; *Schneider* v. *State,* 308 U. S. 147, 161 (1939) ; *NAACP* v. *Alabama,* 357 U. S. 449, 464 (1958).

on protected rights of speech, press, or association.[19] The heart of the claim is that the burden on news gathering resulting from compelling reporters to disclose confidential information outweighs any public interest in obtaining the information.[20]

We do not question the significance of free speech, press, or assembly to the country's welfare. Nor is it suggested that news gathering does not qualify for First Amendment protection; without some protection for seeking out the news, freedom of the press could be eviscerated. But these cases involve no intrusions upon speech or assembly, no prior restraint or restriction on what the press may publish, and no express or implied command that the press publish what it prefers to withhold. No exaction or tax for the privilege of publishing, and no penalty, civil or criminal, related to the content of published material is at issue here. The use of confidential sources by the press is not forbidden or restricted; reporters remain free to seek news from

[19] *Freedman* v. *Maryland*, 380 U. S. 51, 56 (1965); *NAACP* v. *Alabama*, 377 U. S. 288, 307 (1964); *Martin* v. *City of Struthers*, 319 U. S. 141, 147 (1943); *Elfbrandt* v. *Russell*, 384 U. S. 11, 18 (1966).

[20] There has been a great deal of writing in recent years on the existence of a newsman's constitutional right of nondisclosure of confidential information. See, *e. g.*, Beaver, The Newsman's Code, The Claim of Privilege and Everyman's Right to Evidence, 47 Ore. L. Rev. 243 (1968); Guest & Stanzler, The Constitutional Argument for Newsmen Concealing Their Sources, 64 Nw. U. L. Rev. 18 (1969); Note, Reporters and Their Sources: The Constitutional Right to a Confidential Relationship, 80 Yale L. J. 317 (1970); Comment, The Newsman's Privilege: Government Investigations, Criminal Prosecutions and Private Litigation, 58 Calif. L. Rev. 1198 (1970); Note, The Right of the Press to Gather Information, 71 Col. L. Rev. 838 (1971); Nelson, The Newsmen's Privilege Against Disclosure of Confidential Sources and Information, 24 Vand. L. Rev. 667 (1971).

any source by means within the law. No attempt is made to require the press to publish its sources of information or indiscriminately to disclose them on request.

The sole issue before us is the obligation of reporters to respond to grand jury subpoenas as other citizens do and to answer questions relevant to an investigation into the commission of crime. Citizens generally are not constitutionally immune from grand jury subpoenas; and neither the First Amendment nor any other constitutional provision protects the average citizen from disclosing to a grand jury information that he has received in confidence.[21] The claim is, however, that reporters are exempt from these obligations because if forced to respond to subpoenas and identify their sources or disclose other confidences, their informants will refuse or be reluctant to furnish newsworthy information in the future. This asserted burden on news gathering is said to make compelled testimony from newsmen constitutionally suspect and to require a privileged position for them.

It is clear that the First Amendment does not invalidate every incidental burdening of the press that may result from the enforcement of civil or criminal statutes of general applicability. Under prior cases, otherwise valid laws serving substantial public interests may be enforced against the press as against others, despite

---

[21] "In general, then, the mere fact that a communication was made in express confidence, or in the implied confidence of a confidential relation, does not create a privilege.

". . . No pledge of privacy nor oath of secrecy can avail against demand for the truth in a court of justice." 8 J. Wigmore, Evidence § 2286 (McNaughton rev. 1961). This was not always the rule at common law, however. In 17th century England, the obligations of honor among gentlemen were occasionally recognized as privileging from compulsory disclosure information obtained in exchange for a promise of confidence. See *Bulstrod* v. *Letchmere*, 2 Freem. 6, 22 Eng. Rep. 1019 (1676); *Lord Grey's Trial*, 9 How. St. Tr. 127 (1682).

the possible burden that may be imposed. The Court has emphasized that "[t]he publisher of a newspaper has no special immunity from the application of general laws. He has no special privilege to invade the rights and liberties of others." *Associated Press* v. *NLRB*, 301 U. S. 103, 132–133 (1937). It was there held that the Associated Press, a news-gathering and disseminating organization, was not exempt from the requirements of the National Labor Relations Act. The holding was reaffirmed in *Oklahoma Press Publishing Co.* v. *Walling*, 327 U. S. 186, 192–193 (1946), where the Court rejected the claim that applying the Fair Labor Standards Act to a newspaper publishing business would abridge the freedom of press guaranteed by the First Amendment. See also *Mabee* v. *White Plains Publishing Co.*, 327 U. S. 178 (1946). *Associated Press* v. *United States*, 326 U. S. 1 (1945), similarly overruled assertions that the First Amendment precluded application of the Sherman Act to a news-gathering and disseminating organization. Cf. *Indiana Farmer's Guide Publishing Co.* v. *Prairie Farmer Publishing Co.*, 293 U. S. 268, 276 (1934); *Citizen Publishing Co.* v. *United States*, 394 U. S. 131, 139 (1969); *Lorain Journal Co.* v. *United States*, 342 U. S. 143, 155–156 (1951). Likewise, a newspaper may be subjected to nondiscriminatory forms of general taxation. *Grosjean* v. *American Press Co.*, 297 U. S. 233, 250 (1936); *Murdock* v. *Pennsylvania*, 319 U. S. 105, 112 (1943).

The prevailing view is that the press is not free to publish with impunity everything and anything it desires to publish. Although it may deter or regulate what is said or published, the press may not circulate knowing or reckless falsehoods damaging to private reputation without subjecting itself to liability for damages, including punitive damages, or even criminal prosecution. See *New York Times Co.* v. *Sullivan*, 376 U. S. 254,

279–280 (1964); *Garrison* v. *Louisiana,* 379 U. S. 64, 74 (1964); *Curtis Publishing Co.* v. *Butts,* 388 U. S. 130, 147 (1967) (opinion of Harlan, J.,); *Monitor Patriot Co.* v. *Roy,* 401 U. S. 265, 277 (1971). A newspaper or a journalist may also be punished for contempt of court, in appropriate circumstances. *Craig* v. *Harney,* 331 U. S. 367, 377–378 (1947).

It has generally been held that the First Amendment does not guarantee the press a constitutional right of special access to information not available to the public generally. *Zemel* v. *Rusk,* 381 U. S. 1, 16–17 (1965); *New York Times Co.* v. *United States,* 403 U. S. 713, 728–730 (1971), (STEWART, J., concurring); *Tribune Review Publishing Co.* v. *Thomas,* 254 F. 2d 883, 885 (CA3 1958); *In the Matter of United Press Assns.* v. *Valente,* 308 N. Y. 71, 77, 123 N. E. 2d 777, 778 (1954). In *Zemel* v. *Rusk, supra,* for example, the Court sustained the Government's refusal to validate passports to Cuba even though that restriction "render[ed] less than wholly free the flow of information concerning that country." *Id.,* at 16. The ban on travel was held constitutional, for "[t]he right to speak and publish does not carry with it the unrestrained right to gather information." *Id.,* at 17.[22]

Despite the fact that news gathering may be hampered, the press is regularly excluded from grand jury proceedings, our own conferences, the meetings of other official bodies gathered in executive session, and the meetings of private organizations. Newsmen have no constitutional right of access to the scenes of crime or

---

[22] "There are few restrictions on action which could not be clothed by ingenious argument in the garb of decreased data flow. For example, the prohibition of unauthorized entry into the White House diminishes the citizen's opportunities to gather information he might find relevant to his opinion of the way the country is being run, but that does not make entry into the White House a First Amendment right." 381 U. S., at 16–17.

disaster when the general public is excluded, and they may be prohibited from attending or publishing information about trials if such restrictions are necessary to assure a defendant a fair trial before an impartial tribunal. In *Sheppard* v. *Maxwell,* 384 U. S. 333 (1966), for example, the Court reversed a state court conviction where the trial court failed to adopt "stricter rules governing the use of the courtroom by newsmen, as Sheppard's counsel requested," neglected to insulate witnesses from the press, and made no "effort to control the release of leads, information, and gossip to the press by police officers, witnesses, and the counsel for both sides." *Id.,* at 358, 359. "[T]he trial court might well have proscribed extrajudicial statements by any lawyer, party, witness, or court official which divulged prejudicial matters." *Id.,* at 361. See also *Estes* v. *Texas,* 381 U. S. 532, 539–540 (1965); *Rideau* v. *Louisiana,* 373 U. S. 723, 726 (1963).

It is thus not surprising that the great weight of authority is that newsmen are not exempt from the normal duty of appearing before a grand jury and answering questions relevant to a criminal investigation. At common law, courts consistently refused to recognize the existence of any privilege authorizing a newsman to refuse to reveal confidential information to a grand jury. See, *e. g., Ex parte Lawrence,* 116 Cal. 298, 48 P. 124 (1897); *Plunkett* v. *Hamilton,* 136 Ga. 72, 70 S. E. 781 (1911); *Clein* v. *State,* 52 So. 2d 117 (Fla. 1950); *In re Grunow,* 84 N. J. L. 235, 85 A. 1011 (1913); *People ex rel. Mooney* v. *Sheriff,* 269 N. Y. 291, 199 N. E. 415 (1936); *Joslyn* v. *People,* 67 Colo. 297, 184 P. 375 (1919); *Adams* v. *Associated Press,* 46 F. R. D. 439 (SD Tex. 1969); *Brewster* v. *Boston Herald-Traveler Corp.,* 20 F. R. D. 416 (Mass. 1957). See generally Annot., 7 A. L. R. 3d 591 (1966). In 1958, a news gatherer asserted for the first time that the First Amend-

ment exempted confidential information from public disclosure pursuant to a subpoena issued in a civil suit, *Garland* v. *Torre,* 259 F. 2d 545 (CA2), cert. denied, 358 U. S. 910 (1958), but the claim was denied, and this argument has been almost uniformly rejected since then, although there are occasional dicta that, in circumstances not presented here, a newsman might be excused. *In re Goodfader,* 45 Haw. 317, 367 P. 2d 472 (1961); *In re Taylor,* 412 Pa. 32, 193 A. 2d 181 (1963); *State* v. *Buchanan,* 250 Ore. 244, 436 P. 2d 729, cert. denied, 392 U. S. 905 (1968); *Murphy* v. *Colorado* (No. 19604, Sup. Ct. Colo.), cert. denied, 365 U. S. 843 (1961) (unreported, discussed in *In re Goodfader, supra,* at 366, 367 P. 2d, at 498 (Mizuha, J., dissenting)). These courts have applied the presumption against the existence of an asserted testimonial privilege, *United States* v. *Bryan,* 339 U. S. 323, 331 (1950), and have concluded that the First Amendment interest asserted by the newsman was outweighed by the general obligation of a citizen to appear before a grand jury or at trial, pursuant to a subpoena, and give what information he possesses. The opinions of the state courts in *Branzburg* and *Pappas* are typical of the prevailing view, although a few recent cases, such as *Caldwell,* have recognized and given effect to some form of constitutional newsman's privilege. See *State* v. *Knops,* 49 Wis. 2d 647, 183 N. W. 2d 93 (1971) (dictum); *Alioto* v. *Cowles Communications, Inc.,* C. A. No. 52150 (ND Cal. 1969); *In re Grand Jury Witnesses,* 322 F. Supp. 573 (ND Cal. 1970); *People* v. *Dohrn,* Crim. No. 69-3808 (Cook County, Ill., Cir. Ct. 1970).

The prevailing constitutional view of the newsman's privilege is very much rooted in the ancient role of the grand jury that has the dual function of determining if there is probable cause to believe that a crime has been committed and of protecting citizens against un-

founded criminal prosecutions.[23] Grand jury proceedings are constitutionally mandated for the institution of federal criminal prosecutions for capital or other serious crimes, and "its constitutional prerogatives are rooted in long centuries of Anglo-American history." *Hannah* v. *Larche,* 363 U. S. 420, 489–490 (1960) (Frankfurter, J., concurring in result). The Fifth Amendment provides that "[n]o person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a Grand Jury."[24] The adoption of the grand jury "in our Constitution as the sole method for preferring charges in serious criminal cases shows the high place it held as an instrument of justice." *Costello* v. *United States,* 350 U. S. 359, 362 (1956). Although state systems of criminal procedure differ greatly among themselves, the grand jury is similarly guaranteed by many state constitutions and plays an important role in fair and effective law enforcement in the overwhelm-

---

[23] "Historically, [the grand jury] has been regarded as a primary security to the innocent against hasty, malicious and oppressive persecution; it serves the invaluable function in our society of standing between the accuser and the accused . . . to determine whether a charge is founded upon reason or was dictated by an intimidating power or by malice and personal ill will." *Wood* v. *Georgia,* 370 U. S. 375, 390 (1962) (footnote omitted).

[24] It has been held that "infamous" punishments include confinement at hard labor, *United States* v. *Moreland,* 258 U. S. 433 (1922); incarceration in a penitentiary, *Mackin* v. *United States,* 117 U. S. 348 (1886); and imprisonment for more than a year, *Barkman* v. *Sanford,* 162 F. 2d 592 (CA5), cert. denied, 332 U. S. 816 (1947). Fed. Rule Crim. Proc. 7 (a) has codified these holdings: "An offense which may be punished by death shall be prosecuted by indictment. An offense which may be punished by imprisonment for a term exceeding one year or at hard labor shall be prosecuted by indictment or, if indictment is waived, it may be prosecuted by information. Any other offense may be prosecuted by indictment or by information."

ing majority of the States.[25] Because its task is to inquire into the existence of possible criminal conduct and to return only well-founded indictments, its investigative powers are necessarily broad. "It is a grand inquest, a body with powers of investigation and inquisition, the scope of whose inquiries is not to be limited narrowly by questions of propriety or forecasts of the probable result of the investigation, or by doubts whether any particular individual will be found properly subject to an accusation of crime." *Blair* v. *United States,* 250 U. S. 273, 282 (1919). Hence, the grand jury's authority to subpoena witnesses is not only historic, *id.,* at 279–281, but essential to its task. Although the powers of the grand jury are not unlimited and are subject to the supervision of a judge, the longstanding principle that "the public . . . has a right to every man's evidence," except for those persons protected by a constitutional, common-law, or statutory privilege, *United States* v. *Bryan,* 339 U. S., at 331; *Blackmer* v. *United States,* 284 U. S. 421, 438 (1932); 8 J. Wigmore, Evidence § 2192 (McNaughton rev. 1961), is particularly applicable to grand jury proceedings.[26]

---

[25] Although indictment by grand jury is not part of the due process of law guaranteed to state criminal defendants by the Fourteenth Amendment, *Hurtado* v. *California,* 110 U. S. 516 (1884), a recent study reveals that 32 States require that certain kinds of criminal prosecutions be initiated by indictment. Spain, The Grand Jury, Past and Present: A Survey, 2 Am. Crim. L. Q. 119, 126–142 (1964). In the 18 States in which the prosecutor may proceed by information, the grand jury is retained as an alternative means of invoking the criminal process and as an investigative tool. *Ibid.*

[26] Jeremy Bentham vividly illustrated this maxim:

"Are men of the first rank and consideration—are men high in office— men whose time is not less valuable to the public than to themselves—are such men to be forced to quit their business, their functions, and what is more than all, their pleasure, at the beck of every idle or malicious adversary, to dance attendance upon every petty

A number of States have provided newsmen a statutory privilege of varying breadth,[27] but the majority have not done so, and none has been provided by federal statute.[28] Until now the only testimonial privilege for unofficial witnesses that is rooted in the Federal Con-

cause? Yes, as far as it is necessary, they and everybody. . . . Were the Prince of Wales, the Archbishop of Canterbury, and the Lord High Chancellor, to be passing by in the same coach, while a chimney-sweeper and a barrow-woman were in dispute about a halfpennyworth of apples, and the chimney-sweeper or the barrow-woman were to think proper to call upon them for their evidence, could they refuse it? No, most certainly." 4 The Works of Jeremy Bentham 320–321 (J. Bowring ed. 1843).

In *United States* v. *Burr*, 25 F. Cas. 30, 34 (No. 14,692d) (CC Va. 1807), Chief Justice Marshall, sitting on Circuit, opined that in proper circumstances a subpoena could be issued to the President of the United States.

[27] Thus far, 17 States have provided some type of statutory protection to a newsman's confidential sources:

Ala. Code, Tit. 7, § 370 (1960); Alaska Stat. § 09.25.150 (Supp. 1971); Ariz. Rev. Stat. Ann. § 12–2237 (Supp. 1971–1972); Ark. Stat. Ann. § 43–917 (1964); Cal. Evid. Code § 1070 (Supp. 1972); Ind. Ann. Stat. § 2–1733 (1968); Ky. Rev. Stat. § 421.100 (1962); La. Rev. Stat. Ann. §§ 45:1451–45:1454 (Supp. 1972); Md. Ann. Code, Art. 35, § 2 (1971); Mich. Comp. Laws § 767.5a (Supp. 1956), Mich. Stat. Ann. § 28.945 (1) (1954); Mont. Rev. Codes Ann. § 93–601–2 (1964); Nev. Rev. Stat. § 49.275 (1971); N. J. Rev. Stat. §§ 2A:84A–21, 2A:84A–29 (Supp. 1972–1973); N. M. Stat. Ann. § 20–1–12.1 (1970); N. Y. Civ. Rights Law § 79–h (Supp. 1971–1972); Ohio Rev. Code Ann. § 2739.12 (1954); Pa. Stat. Ann., Tit. 28, § 330 (Supp. 1972–1973).

[28] Such legislation has been introduced, however. See, *e. g.,* S. 1311, 92d Cong., 1st Sess. (1971); S. 3552, 91st Cong., 2d Sess. (1970); H. R. 16328, H. R. 16704, 91st Cong., 2d Sess. (1970); S. 1851, 88th Cong., 1st Sess. (1963); H. R. 8519, H. R. 7787, 88th Cong., 1st Sess. (1963); S. 965, 86th Cong., 1st Sess. (1959); H. R. 355, 86th Cong., 1st Sess. (1959). For a general analysis of proposed congressional legislation, see Staff of Senate Committee on the Judiciary, 89th Cong., 2d Sess., The Newsman's Privilege (Comm. Print 1966).

stitution is the Fifth Amendment privilege against compelled self-incrimination. We are asked to create another by interpreting the First Amendment to grant newsmen a testimonial privilege that other citizens do not enjoy. This we decline to do.[29] Fair and effective law enforcement aimed at providing security for the person and property of the individual is a fundamental function of government, and the grand jury plays an important, constitutionally mandated role in this process. On the records now before us, we perceive no basis for holding that the public interest in law enforcement and in ensuring effective grand jury proceedings is insufficient to override the consequential, but uncertain, burden on news gathering that is said to result from insisting that reporters, like other citizens, respond to relevant

---

[29] The creation of new testimonial privileges has been met with disfavor by commentators since such privileges obstruct the search for truth. Wigmore condemns such privileges as "so many derogations from a positive general rule [that everyone is obligated to testify when properly summoned]" and as "obstacle[s] to the administration of justice." 8 J. Wigmore, Evidence § 2192 (McNaughton rev. 1961). His criticism that *"all privileges of exemption from this duty are exceptional,* and are therefore to be discountenanced," *id.,* at § 2192, p. 73 (emphasis in original) has been frequently echoed. Morgan, Foreword, Model Code of Evidence 22–30 (1942); 2 Z. Chafee, Government and Mass Communications 496–497 (1947); Report of ABA Committee on Improvements in the Law of Evidence, 63 A. B. A. Reports 595 (1938); C. McCormick, Evidence 159 (2d ed. 1972); Chafee, Privileged Communications: Is Justice Served or Obstructed by Closing the Doctor's Mouth on the Witness Stand?, 52 Yale L. J. 607 (1943); Ladd, Privileges, 1969 Law & the Social Order 555, 556; 58 Am. Jur., Witnesses § 546 (1948); 97 C. J. S., Witnesses § 259 (1957); *McMann* v. *Securities and Exchange Commission,* 87 F. 2d 377, 378 (CA2 1937) (L. Hand, J.). Neither the ALI's Model Code of Evidence (1942), the Uniform Rules of Evidence of the National Conference of Commissioners on Uniform State Laws (1953), nor the Proposed Rules of Evidence for the United States Courts and Magistrates (rev. ed. 1971) has included a newsman's privilege.

questions put to them in the course of a valid grand jury investigation or criminal trial.

This conclusion itself involves no restraint on what newspapers may publish or on the type or quality of information reporters may seek to acquire, nor does it threaten the vast bulk of confidential relationships between reporters and their sources. Grand juries address themselves to the issues of whether crimes have been committed and who committed them. Only where news sources themselves are implicated in crime or possess information relevant to the grand jury's task need they or the reporter be concerned about grand jury subpoenas. Nothing before us indicates that a large number or percentage of *all* confidential news sources falls into either category and would in any way be deterred by our holding that the Constitution does not, as it never has, exempt the newsman from performing the citizen's normal duty of appearing and furnishing information relevant to the grand jury's task.

The preference for anonymity of those confidential informants involved in actual criminal conduct is presumably a product of their desire to escape criminal prosecution, and this preference, while understandable, is hardly deserving of constitutional protection. It would be frivolous to assert—and no one does in these cases—that the First Amendment, in the interest of securing news or otherwise, confers a license on either the reporter or his news sources to violate valid criminal laws. Although stealing documents or private wiretapping could provide newsworthy information, neither reporter nor source is immune from conviction for such conduct, whatever the impact on the flow of news. Neither is immune, on First Amendment grounds, from testifying against the other, before the grand jury or at a criminal trial. The Amendment does not reach so far as to override the interest of the public in en-

suring that neither reporter nor source is invading the rights of other citizens through reprehensible conduct forbidden to all other persons. To assert the contrary proposition

> "is to answer it, since it involves in its very state-ment the contention that the freedom of the press is the freedom to do wrong with impunity and im-plies the right to frustrate and defeat the discharge of those governmental duties upon the performance of which the freedom of all, including that of the press, depends. . . . It suffices to say that, however complete is the right of the press to state public things and discuss them, that right, as every other right enjoyed in human society, is subject to the restraints which separate right from wrong-doing." *Toledo Newspaper Co.* v. *United States,* 247 U. S. 402, 419–420 (1918).[30]

Thus, we cannot seriously entertain the notion that the First Amendment protects a newsman's agreement to conceal the criminal conduct of his source, or evi-dence thereof, on the theory that it is better to write about crime than to do something about it. Insofar as any reporter in these cases undertook not to reveal or testify about the crime he witnessed, his claim of privilege under the First Amendment presents no sub-stantial question. The crimes of news sources are no less reprehensible and threatening to the public interest when witnessed by a reporter than when they are not.

---

[30] The holding in this case involved a construction of the Con-tempt of Court Act of 1831, 4 Stat. 487, which permitted summary trial of contempts "so near [to the court] as to obstruct the admin-istration of justice." The Court held that the Act required only that the conduct have a "direct tendency to prevent and obstruct the discharge of judicial duty." 247 U. S., at 419. This view was overruled and the Act given a much narrower reading in *Nye* v. *United States,* 313 U. S. 33, 47–52 (1941). See *Bloom* v. *Illinois,* 391 U. S. 194, 205–206 (1968).

There remain those situations where a source is not engaged in criminal conduct but has information suggesting illegal conduct by others. Newsmen frequently receive information from such sources pursuant to a tacit or express agreement to withhold the source's name and suppress any information that the source wishes not published. Such informants presumably desire anonymity in order to avoid being entangled as a witness in a criminal trial or grand jury investigation. They may fear that disclosure will threaten their job security or personal safety or that it will simply result in dishonor or embarrassment.

The argument that the flow of news will be diminished by compelling reporters to aid the grand jury in a criminal investigation is not irrational, nor are the records before us silent on the matter. But we remain unclear how often and to what extent informers are actually deterred from furnishing information when newsmen are forced to testify before a grand jury. The available data indicate that some newsmen rely a great deal on confidential sources and that some informants are particularly sensitive to the threat of exposure and may be silenced if it is held by this Court that, ordinarily, newsmen must testify pursuant to subpoenas,[31] but the evidence fails to demonstrate that there would be a significant constriction of the flow of news to the public if this Court reaffirms the prior common-law and constitutional rule regarding the testimonial obligations of newsmen. Estimates of the inhibiting effect of such subpoenas on the willingness of informants to make disclosures to newsmen are widely divergent and

---

[31] Respondent Caldwell attached a number of affidavits from prominent newsmen to his initial motion to quash, which detail the experiences of such journalists after they have been subpoenaed. Appendix to No. 70–57, pp. 22–61.

to a great extent speculative.[32]  It would be difficult to canvass the views of the informants themselves; surveys of reporters on this topic are chiefly opinions of predicted informant behavior and must be viewed in the light of the professional self-interest of the interviewees.[33]  Reliance by the press on confidential informants does not mean that all such sources will in fact dry up because of the later possible appearance of the newsman before a grand jury.  The reporter may never be called and if he objects to testifying, the prosecution may not insist.  Also, the relationship of many informants to the press is a symbiotic one which is unlikely to be greatly inhibited by the threat of subpoena: quite often, such informants are members of a minority political or cultural group that

---

[32] Cf., e. g., the results of a study conducted by Guest & Stanzler, which appears as an appendix to their article, supra, n. 20.  A number of editors of daily newspapers of varying circulation were asked the question, "Excluding one- or two-sentence gossip items, on the average how many stories based on information received in confidence are published in your paper each year?  Very rough estimate."  Answers varied significantly, e. g., "Virtually innumerable," Tucson Daily Citizen (41,969 daily circ.), "Too many to remember," Los Angeles Herald-Examiner (718,221 daily circ.), "Occasionally," Denver Post (252,084 daily circ.), "Rarely," Cleveland Plain Dealer (370,499 daily circ.), "Very rare, some politics," Oregon Journal (146,403 daily circ.).  This study did not purport to measure the extent of deterrence of informants caused by subpoenas to the press.

[33] In his Press Subpoenas: An Empirical and Legal Analysis, Study Report of the Reporters' Committee on Freedom of the Press 6–12, Prof. Vince Blasi discusses these methodological problems.  Prof. Blasi's survey found that slightly more than half of the 975 reporters questioned said that they relied on regular confidential sources for at least 10% of their stories.  Id., at 21.  Of this group of reporters, only 8% were able to say with some certainty that their professional functioning had been adversely affected by the threat of subpoena; another 11% were not certain whether or not they had been adversely affected.  Id., at 53.

relies heavily on the media to propagate its views, publicize its aims, and magnify its exposure to the public. Moreover, grand juries characteristically conduct secret proceedings, and law enforcement officers are themselves experienced in dealing with informers, and have their own methods for protecting them without interference with the effective administration of justice. There is little before us indicating that informants whose interest in avoiding exposure is that it may threaten job security, personal safety, or peace of mind, would in fact be in a worse position, or would think they would be, if they risked placing their trust in public officials as well as reporters. We doubt if the informer who prefers anonymity but is sincerely interested in furnishing evidence of crime will always or very often be deterred by the prospect of dealing with those public authorities characteristically charged with the duty to protect the public interest as well as his.

Accepting the fact, however, that an undetermined number of informants not themselves implicated in crime will nevertheless, for whatever reason, refuse to talk to newsmen if they fear identification by a reporter in an official investigation, we cannot accept the argument that the public interest in possible future news about crime from undisclosed, unverified sources must take precedence over the public interest in pursuing and prosecuting those crimes reported to the press by informants and in thus deterring the commission of such crimes in the future.

We note first that the privilege claimed is that of the reporter, not the informant, and that if the authorities independently identify the informant, neither his own reluctance to testify nor the objection of the newsman would shield him from grand jury inquiry, whatever the impact on the flow of news or on his future usefulness as a secret source of information. More impor-

tant, it is obvious that agreements to conceal information relevant to commission of crime have very little to recommend them from the standpoint of public policy. Historically, the common law recognized a duty to raise the "hue and cry" and report felonies to the authorities.[34] Misprision of a felony—that is, the concealment of a felony "which a man knows, but never assented to . . . [so as to become] either principal or accessory," 4 W. Blackstone, Commentaries *121, was often said to be a common-law crime.[35] The first Congress passed a statute, 1 Stat. 113, § 6, as amended, 35 Stat. 1114, § 146, 62 Stat. 684, which is still in effect, defining a federal crime of misprision:

> "Whoever, having knowledge of the actual commission of a felony cognizable by a court of the United States, conceals and does not as soon as possible make known the same to some judge or other person in civil or military authority under the United States, shall be [guilty of misprision]." 18 U. S. C. § 4.[36]

---

[34] See Statute of Westminster First, 3 Edw. 1, c. 9, p. 43 (1275); Statute of Westminster Second, 13 Edw. 1, c. 6, pp. 114–115 (1285); Sheriffs Act of 1887, 50 & 51 Vict., c. 55, § 8 (1); 4 W. Blackstone, Commentaries *293–295; 2 W. Holdsworth, History of English Law 80–81, 101–102 (3d ed. 1927); 4 id., at 521–522.

[35] See, e. g., Scrope's Case, referred to in 3 Coke's Institute 36; Rex v. Cowper, 5 Mod. 206, 87 Eng. Rep. 611 (1696); Proceedings under a Special Commission for the County of York, 31 How. St. Tr. 965, 969 (1813); Sykes v. Director of Public Prosecutions, [1961] 3 W. L. R. 371. But see Glazebrook, Misprision of Felony—Shadow or Phantom?, 8 Am. J. Legal Hist. 189 (1964). See also Act 5 & 6 Edw. 6, c. 11 (1552).

[36] This statute has been construed, however, to require both knowledge of a crime and some affirmative act of concealment or participation. Bratton v. United States, 73 F. 2d 795 (CA10 1934); United States v. Farrar, 38 F. 2d 515, 516 (Mass.), aff'd on other grounds,

It is apparent from this statute, as well as from our history and that of England, that concealment of crime and agreements to do so are not looked upon with favor. Such conduct deserves no encomium, and we decline now to afford it First Amendment protection by denigrating the duty of a citizen, whether reporter or informer, to respond to grand jury subpoena and answer relevant questions put to him.

Of course, the press has the right to abide by its agreement not to publish all the information it has, but the right to withhold news is not equivalent to a First Amendment exemption from the ordinary duty of all other citizens to furnish relevant information to a grand jury performing an important public function. Private restraints on the flow of information are not so favored by the First Amendment that they override all other public interests. As Mr. Justice Black declared in another context, "[f]reedom of the press from governmental interference under the First Amendment does not sanction repression of that freedom by private interests." *Associated Press* v. *United States,* 326 U. S., at 20.

Neither are we now convinced that a virtually impenetrable constitutional shield, beyond legislative or judicial control, should be forged to protect a private system of informers operated by the press to report on criminal conduct, a system that would be unaccountable to the public, would pose a threat to the citizen's justifiable expectations of privacy, and would equally protect well-intentioned informants and those who for pay or otherwise betray their trust to their employer or associates. The public through its elected and appointed

---

281 U. S. 624 (1930); *United States* v. *Norman,* 391 F. 2d 212 (CA6), cert. denied, 390 U. S. 1014 (1968); *Lancey* v. *United States,* 356 F. 2d 407 (CA9), cert. denied, 385 U. S. 922 (1966). Cf. *Marbury* v. *Brooks,* 7 Wheat. 556, 575 (1822) (Marshall, C. J.).

law enforcement officers regularly utilizes informers, and in proper circumstances may assert a privilege against disclosing the identity of these informers. But

"[t]he purpose of the privilege is the furtherance and protection of the public interest in effective law enforcement. The privilege recognizes the obligation of citizens to communicate their knowledge of the commission of crimes to law-enforcement officials and, by preserving their anonymity, encourages them to perform that obligation." *Roviaro* v. *United States,* 353 U. S. 53, 59 (1957).

Such informers enjoy no constitutional protection. Their testimony is available to the public when desired by grand juries or at criminal trials; their identity cannot be concealed from the defendant when it is critical to his case. *Id.,* at 60–61, 62; *McCray* v. *Illinois,* 386 U. S. 300, 310 (1967); *Smith* v. *Illinois,* 390 U. S. 129, 131 (1968); *Alford* v. *United States,* 282 U. S. 687, 693 (1931). Clearly, this system is not impervious to control by the judiciary and the decision whether to unmask an informer or to continue to profit by his anonymity is in public, not private, hands. We think that it should remain there and that public authorities should retain the options of either insisting on the informer's testimony relevant to the prosecution of crime or of seeking the benefit of further information that his exposure might prevent.

We are admonished that refusal to provide a First Amendment reporter's privilege will undermine the freedom of the press to collect and disseminate news. But this is not the lesson history teaches us. As noted previously, the common law recognized no such privilege, and the constitutional argument was not even asserted until 1958. From the beginning of our country the press has operated without constitutional pro-

tection for press informants, and the press has flourished. The existing constitutional rules have not been a serious obstacle to either the development or retention of confidential news sources by the press.[37]

It is said that currently press subpoenas have multiplied,[38] that mutual distrust and tension between press and officialdom have increased, that reporting styles have changed, and that there is now more need for confidential sources, particularly where the press seeks news about minority cultural and political groups or dissident organizations suspicious of the law and public officials. These developments, even if true, are treacherous grounds for a far-reaching interpretation of the First Amendment fastening a nationwide rule on courts, grand juries, and prosecuting officials everywhere. The obligation to testify in response to grand jury subpoenas will not threaten these sources not involved with criminal conduct and without information relevant to grand jury investigations, and we cannot hold that the Constitution places the sources in these two categories either above the law or beyond its reach.

The argument for such a constitutional privilege rests heavily on those cases holding that the infringement of protected First Amendment rights must be no broader than necessary to achieve a permissible governmental purpose, see cases cited at n. 19, *supra*. We do not deal, however, with a governmental institution that has abused

---

[37] Though the constitutional argument for a newsman's privilege has been put forward very recently, newsmen have contended for a number of years that such a privilege was desirable. See, *e. g.*, Siebert & Ryniker, Press Winning Fight to Guard Sources, Editor & Publisher, Sept. 1, 1934, pp. 9, 36–37; G. Bird & F. Merwin, The Press and Society 592 (1971). The first newsman's privilege statute was enacted by Maryland in 1896, and currently is codified as Md. Ann. Code, Art. 35, § 2 (1971).

[38] A list of recent subpoenas to the news media is contained in the appendix to the brief of *amicus* New York Times in No. 70–57.

its proper function, as a legislative committee does when it "expose[s] for the sake of exposure." *Watkins* v. *United States,* 354 U. S. 178, 200 (1957). Nothing in the record indicates that these grand juries were "prob-[ing] at will and without relation to existing need." *DeGregory* v. *Attorney General of New Hampshire,* 383 U. S. 825, 829 (1966). Nor did the grand juries attempt to invade protected First Amendment rights by forcing wholesale disclosure of names and organizational affiliations for a purpose that was not germane to the determination of whether crime has been committed, cf. *NAACP* v. *Alabama,* 357 U. S. 449 (1958); *NAACP* v. *Button,* 371 U. S. 415 (1963); *Bates* v. *Little Rock,* 361 U. S. 516 (1960), and the characteristic secrecy of grand jury proceedings is a further protection against the undue invasion of such rights. See Fed. Rule Crim. Proc. 6 (e). The investigative power of the grand jury is necessarily broad if its public responsibility is to be adequately discharged. *Costello* v. *United States,* 350 U. S., at 364.

The requirements of those cases, see n. 18, *supra,* which hold that a State's interest must be "compelling" or "paramount" to justify even an indirect burden on First Amendment rights, are also met here. As we have indicated, the investigation of crime by the grand jury implements a fundamental governmental role of securing the safety of the person and property of the citizen, and it appears to us that calling reporters to give testimony in the manner and for the reasons that other citizens are called "bears a reasonable relationship to the achievement of the governmental purpose asserted as its justification." *Bates* v. *Little Rock, supra,* at 525. If the test is. that the government "convincingly show a substantial relation between the information sought and a subject of overriding and compelling state interest," *Gibson* v. *Florida Legislative Investigation Committee,*

372 U. S. 539, 546 (1963), it is quite apparent (1) that the State has the necessary interest in extirpating the traffic in illegal drugs, in forestalling assassination attempts on the President, and in preventing the community from being disrupted by violent disorders endangering both persons and property; and (2) that, based on the stories Branzburg and Caldwell wrote and Pappas' admitted conduct, the grand jury called these reporters as they would others—because it was likely that they could supply information to help the government determine whether illegal conduct had occurred and, if it had, whether there was sufficient evidence to return an indictment.

Similar considerations dispose of the reporters' claims that preliminary to requiring their grand jury appearance, the State must show that a crime has been committed and that they possess relevant information not available from other sources, for only the grand jury itself can make this determination. The role of the grand jury as an important instrument of effective law enforcement necessarily includes an investigatory function with respect to determining whether a crime has been committed and who committed it. To this end it must call witnesses, in the manner best suited to perform its task. "When the grand jury is performing its investigatory function into a general problem area . . . society's interest is best served by a thorough and extensive investigation." *Wood* v. *Georgia,* 370 U. S. 375, 392 (1962). A grand jury investigation "is not fully carried out until every available clue has been run down and all witnesses examined in every proper way to find if a crime has been committed." *United States* v. *Stone,* 429 F. 2d 138, 140 (CA2 1970). Such an investigation may be triggered by tips, rumors, evidence proffered by the prosecutor, or the personal knowledge of the grand jurors. *Costello* v. *United States,* 350 U. S., at 362. It is

only after the grand jury has examined the evidence that a determination of whether the proceeding will result in an indictment can be made.

> "It is impossible to conceive that in such cases the examination of witnesses must be stopped until a basis is laid by an indictment formally preferred, when the very object of the examination is to ascertain who shall be indicted." *Hale* v. *Henkel,* 201 U. S. 43, 65 (1906).

See also *Hendricks* v. *United States,* 223 U. S. 178 (1912); *Blair* v. *United States,* 250 U. S., at 282–283. We see no reason to hold that these reporters, any more than other citizens, should be excused from furnishing information that may help the grand jury in arriving at its initial determinations.

The privilege claimed here is conditional, not absolute; given the suggested preliminary showings and compelling need, the reporter would be required to testify. Presumably, such a rule would reduce the instances in which reporters could be required to appear, but predicting in advance when and in what circumstances they could be compelled to do so would be difficult. Such a rule would also have implications for the issuance of compulsory process to reporters at civil and criminal trials and at legislative hearings. If newsmen's confidential sources are as sensitive as they are claimed to be, the prospect of being unmasked whenever a judge determines the situation justifies it is hardly a satisfactory solution to the problem.[39] For them, it would appear that only an absolute privilege would suffice.

---

[39] "Under the case-by-case method of developing rules, it will be difficult for potential informants and reporters to predict whether testimony will be compelled since the decision will turn on the judge's ad hoc assessment in different fact settings of 'importance' or 'relevance' in relation to the free press interest. A 'general' deterrent

We are unwilling to embark the judiciary on a long and difficult journey to such an uncertain destination. The administration of a constitutional newsman's priv-

effect is likely to result. This type of effect stems from the vagueness of the tests and from the uncertainty attending their application. For example, if a reporter's information goes to the 'heart of the matter' in Situation X, another reporter and informant who subsequently are in Situation Y will not know if 'heart of the matter rule X' will be extended to them, and deterrence will thereby result. Leaving substantial discretion with judges to delineate those 'situations' in which rules of 'relevance' or 'importance' apply would therefore seem to undermine significantly the effectiveness of a reporter-informer privilege." Note, Reporters and Their Sources: The Constitutional Right to a Confidential Relationship, 80 Yale L. J. 317, 341 (1970).

*In re Grand Jury Witnesses,* 322 F. Supp. 573 (ND Cal. 1970), illustrates the impact of this *ad hoc* approach. Here, the grand jury was, as in *Caldwell,* investigating the Black Panther Party, and was "inquiring into matters which involve possible violations of Congressional acts passed to protect the person of the President (18 U. S. C. § 1751), to free him from threats (18 U. S. C. § 871), to protect our armed forces from unlawful interference (18 U. S. C. § 2387), conspiracy to commit the foregoing offenses (18 U. S. C. § 371), and related statutes prohibiting acts directed against the security of the government." *Id.,* at 577. The two witnesses, reporters for a Black Panther Party newspaper, were subpoenaed and given Fifth Amendment immunity against criminal prosecution, and they claimed a First Amendment journalist's privilege. The District Court entered a protective order, allowing them to refuse to divulge confidential information until the Government demonstrated "a compelling and overriding national interest in requiring the testimony of [the witnesses] which cannot be served by any alternative means." *Id.,* at 574. The Government claimed that it had information that the witnesses had associated with persons who had conspired to perform some of the criminal acts that the grand jury was investigating. The court held the Government had met its burden and ordered the witnesses to testify:

"The whole point of the investigation is to identify persons known to the [witnesses] who may have engaged in activities violative of the above indicated statutes, and also to ascertain the details of their alleged unlawful activities. All questions directed to such

ilege would present practical and conceptual difficulties of a high order. Sooner or later, it would be necessary to define those categories of newsmen who qualified for the privilege, a questionable procedure in light of the traditional doctrine that liberty of the press is the right of the lonely pamphleteer who uses carbon paper or a mimeograph just as much as of the large metropolitan publisher who utilizes the latest photocomposition methods. Cf. *In re Grand Jury Witnesses,* 322 F. Supp. 573, 574 (ND Cal. 1970). Freedom of the press is a "fundamental personal right" which "is not confined to newspapers and periodicals. It necessarily embraces pamphlets and leaflets. . . . The press in its historic connotation comprehends every sort of publication which affords a vehicle of information and opinion." *Lovell* v. *Griffin,* 303 U. S. 444, 450, 452 (1938). See also *Mills*

---

objectives of the investigation are unquestionably relevant, and any other evaluation thereof by the Court without knowledge of the facts before the Grand Jury would clearly constitute 'undue interference of the Court.' " *Id.,* at 577.

Another illustration is provided by *State* v. *Knops,* 49 Wis. 2d 647, 183 N. W. 2d 93 (1971), in which a grand jury was investigating the August 24, 1970, bombing of Sterling Hall on the University of Wisconsin Madison campus. On August 26, 1970, an "underground" newspaper, the Madison Kaleidoscope, printed a front-page story entitled "The Bombers Tell Why and What Next—Exclusive to Kaleidoscope." An editor of the Kaleidoscope was subpoenaed, appeared, asserted his Fifth Amendment right against self-incrimination, was given immunity, and then pleaded that he had a First Amendment privilege against disclosing his confidential informants. The Wisconsin Supreme Court rejected his claim and upheld his contempt sentence: "[Appellant] faces five very narrow and specific questions, all of which are founded on information which he himself has already volunteered. The purpose of these questions is very clear. The need for answers to them is 'overriding,' to say the least. The need for these answers is nothing short of the public's need (and right) to protect itself from physical attack by apprehending the perpetrators of such attacks." 49 Wis. 2d, at 658, 183 N. W. 2d, at 98–99.

v. *Alabama,* 384 U. S. 214, 219 (1966); *Murdock* v. *Pennsylvania,* 319 U. S. 105, 111 (1943). The informative function asserted by representatives of the organized press in the present cases is also performed by lecturers, political pollsters, novelists, academic researchers, and dramatists. Almost any author may quite accurately assert that he is contributing to the flow of information to the public, that he relies on confidential sources of information, and that these sources will be silenced if he is forced to make disclosures before a grand jury.[40]

In each instance where a reporter is subpoenaed to testify, the courts would also be embroiled in preliminary factual and legal determinations with respect to whether the proper predicate had been laid for the reporter's appearance: Is there probable cause to believe a crime has been committed? Is it likely that the reporter has useful information gained in confidence? Could the grand jury obtain the information elsewhere? Is the official interest sufficient to outweigh the claimed privilege?

Thus, in the end, by considering whether enforcement of a particular law served a "compelling" governmental interest, the courts would be inextricably involved in

---

[40] Such a privilege might be claimed by groups that set up newspapers in order to engage in criminal activity and to therefore be insulated from grand jury inquiry, regardless of Fifth Amendment grants of immunity. It might appear that such "sham" newspapers would be easily distinguishable, yet the First Amendment ordinarily prohibits courts from inquiring into the content of expression, except in cases of obscenity or libel, and protects speech and publications regardless of their motivation, orthodoxy, truthfulness, timeliness, or taste. *New York Times Co.* v. *Sullivan,* 376 U. S., at 269–270; *Kingsley Pictures Corp.* v. *Regents,* 360 U. S. 684, 689 (1959); *Winters* v. *New York,* 333 U. S. 507, 510 (1948); *Thomas* v. *Collins,* 323 U. S., at 537. By affording a privilege to some organs of communication but not to others, courts would inevitably be discriminating on the basis of content.

distinguishing between the value of enforcing different criminal laws. By requiring testimony from a reporter in investigations involving some crimes but not in others, they would be making a value judgment that a legislature had declined to make, since in each case the criminal law involved would represent a considered legislative judgment, not constitutionally suspect, of what conduct is liable to criminal prosecution. The task of judges, like other officials outside the legislative branch, is not to make the law but to uphold it in accordance with their oaths.

At the federal level, Congress has freedom to determine whether a statutory newsman's privilege is necessary and desirable and to fashion standards and rules as narrow or broad as deemed necessary to deal with the evil discerned and, equally important, to refashion those rules as experience from time to time may dictate. There is also merit in leaving state legislatures free, within First Amendment limits, to fashion their own standards in light of the conditions and problems with respect to the relations between law enforcement officials and press in their own areas. It goes without saying, of course, that we are powerless to bar state courts from responding in their own way and construing their own constitutions so as to recognize a newsman's privilege, either qualified or absolute.

In addition, there is much force in the pragmatic view that the press has at its disposal powerful mechanisms of communication and is far from helpless to protect itself from harassment or substantial harm. Furthermore, if what the newsmen urged in these cases is true—that law enforcement cannot hope to gain and may suffer from subpoenaing newsmen before grand juries—prosecutors will be loath to risk so much for so little. Thus, at the federal level the Attorney General has already fashioned a set of rules for federal officials in con-

nection with subpoenaing members of the press to testify before grand juries or at criminal trials.[41]  These rules are a major step in the direction the reporters herein desire to move.  They may prove wholly sufficient to resolve the bulk of disagreements and controversies between press and federal officials.

Finally, as we have earlier indicated, news gathering is not without its First Amendment protections, and grand jury investigations if instituted or conducted other than in good faith, would pose wholly different issues for resolution under the First Amendment.[42]  Official harassment of the press undertaken not for purposes of law enforcement but to disrupt a reporter's relation-

[41] The Guidelines for Subpoenas to the News Media were first announced in a speech by the Attorney General on August 10, 1970, and then were expressed in Department of Justice Memo. No. 692 (Sept. 2, 1970), which was sent to all United States Attorneys by the Assistant Attorney General in charge of the Criminal Division. The Guidelines state that: "The Department of Justice recognizes that compulsory process in some circumstances may have a limiting effect on the exercise of First Amendment rights.  In determining whether to request issuance of a subpoena to the press, the approach in every case must be to weigh that limiting effect against the public interest to be served in the fair administration of justice" and that: "The Department of Justice does not consider the press 'an investigative arm of the government.'  Therefore, all reasonable attempts should be made to obtain information from non-press sources before there is any consideration of subpoenaing the press."  The Guidelines provide for negotiations with the press and require the express authorization of the Attorney General for such subpoenas.  The principles to be applied in authorizing such subpoenas are stated to be whether there is "sufficient reason to believe that the information sought [from the journalist] is essential to a successful investigation," and whether the Government has unsuccessfully attempted to obtain the information from alternative non-press sources.  The Guidelines provide, however, that in "emergencies and other unusual situations," subpoenas may be issued which do not exactly conform to the Guidelines.

[42] Cf. *Younger* v. *Harris,* 401 U. S. 37, 49, 53–54 (1971).

ship with his news sources would have no justification. Grand juries are subject to judicial control and subpoenas to motions to quash. We do not expect courts will forget that grand juries must operate within the limits of the First Amendment as well as the Fifth.

## III

We turn, therefore, to the disposition of the cases before us. From what we have said, it necessarily follows that the decision in *United States* v. *Caldwell,* No. 70–57, must be reversed. If there is no First Amendment privilege to refuse to answer the relevant and material questions asked during a good-faith grand jury investigation, then it is *a fortiori* true that there is no privilege to refuse to appear before such a grand jury until the Government demonstrates some "compelling need" for a newsman's testimony. Other issues were urged upon us, but since they were not passed upon by the Court of Appeals, we decline to address them in the first instance.

The decisions in No. 70–85, *Branzburg* v. *Hayes* and *Branzburg* v. *Meigs,* must be affirmed. Here, petitioner refused to answer questions that directly related to criminal conduct that he had observed and written about. The Kentucky Court of Appeals noted that marihuana is defined as a narcotic drug by statute, Ky. Rev. Stat. § 218.010 (14) (1962), and that unlicensed possession or compounding of it is a felony punishable by both fine and imprisonment. Ky. Rev. Stat. § 218.210 (1962). It held that petitioner "saw the commission of the statutory felonies of unlawful possession of marijuana and the unlawful conversion of it into hashish," in *Branzburg* v. *Pound,* 461 S. W. 2d, at 346. Petitioner may be presumed to have observed similar violations of the state narcotics laws during the research he did for the story that forms the basis of the subpoena in *Branzburg* v. *Meigs.* In both cases, if what petitioner wrote was true,

he had direct information to provide the grand jury concerning the commission of serious crimes.

The only question presented at the present time in *In re Pappas*, No. 70-94, is whether petitioner Pappas must appear before the grand jury to testify pursuant to subpoena. The Massachusetts Supreme Judicial Court characterized the record in this case as "meager," and it is not clear what petitioner will be asked by the grand jury. It is not even clear that he will be asked to divulge information received in confidence. We affirm the decision of the Massachusetts Supreme Judicial Court and hold that petitioner must appear before the grand jury to answer the questions put to him, subject, of course, to the supervision of the presiding judge as to "the propriety, purposes, and scope of the grand jury inquiry and the pertinence of the probable testimony." 358 Mass., at 614, 266 N. E. 2d, at 303–304.

*So ordered.*

Mr. Justice Powell, concurring.

I add this brief statement to emphasize what seems to me to be the limited nature of the Court's holding. The Court does not hold that newsmen, subpoenaed to testify before a grand jury, are without constitutional rights with respect to the gathering of news or in safeguarding their sources. Certainly, we do not hold, as suggested in Mr. Justice Stewart's dissenting opinion, that state and federal authorities are free to "annex" the news media as "an investigative arm of government." The solicitude repeatedly shown by this Court for First Amendment freedoms should be sufficient assurance against any such effort, even if one seriously believed that the media—properly free and untrammeled in the fullest sense of these terms—were not able to protect themselves.

As indicated in the concluding portion of the opinion, the Court states that no harassment of newsmen will

be tolerated. If a newsman believes that the grand jury investigation is not being conducted in good faith he is not without remedy. Indeed, if the newsman is called upon to give information bearing only a remote and tenuous relationship to the subject of the investigation, or if he has some other reason to believe that his testimony implicates confidential source relationships without a legitimate need of law enforcement, he will have access to the court on a motion to quash and an appropriate protective order may be entered. The asserted claim to privilege should be judged on its facts by the striking of a proper balance between freedom of the press and the obligation of all citizens to give relevant testimony with respect to criminal conduct. The balance of these vital constitutional and societal interests on a case-by-case basis accords with the tried and traditional way of adjudicating such questions.*

In short, the courts will be available to newsmen under circumstances where legitimate First Amendment interests require protection.

---

*It is to be remembered that Caldwell asserts a constitutional privilege not even to appear before the grand jury unless a court decides that the Government has made a showing that meets the three preconditions specified in the dissenting opinion of Mr. Justice Stewart. To be sure, this would require a "balancing" of interests by the court, but under circumstances and constraints significantly different from the balancing that will be appropriate under the court's decision. The newsman witness, like all other witnesses, will have to appear; he will not be in a position to litigate at the threshold the State's very authority to subpoena him. Moreover, absent the constitutional preconditions that Caldwell and that dissenting opinion would impose as heavy burdens of proof to be carried by the State, the court—when called upon to protect a newsman from improper or prejudicial questioning—would be free to balance the competing interests on their merits in the particular case. The new constitutional rule endorsed by that dissenting opinion would, as a practical matter, defeat such a fair balancing and the essential societal interest in the detection and prosecution of crime would be heavily subordinated.

Mr. Justice Douglas, dissenting in No. 70–57, *United States* v. *Caldwell.*

Caldwell, a black, is a reporter for the New York Times and was assigned to San Francisco with the hope that he could report on the activities and attitudes of the Black Panther Party. Caldwell in time gained the complete confidence of its members and wrote in-depth articles about them.

He was subpoenaed to appear and testify before a federal grand jury and to bring with him notes and tapes covering interviews with its members. A hearing on a motion to quash was held. The District Court ruled that while Caldwell had to appear before the grand jury, he did not have to reveal confidential communications unless the court was satisfied that there was a "compelling and overriding national interest." See 311 F. Supp. 358, 362. Caldwell filed a notice of appeal and the Court of Appeals dismissed the appeal without opinion.

Shortly thereafter a new grand jury was impaneled and it issued a new subpoena for Caldwell to testify. On a motion to quash, the District Court issued an order substantially identical to its earlier one.

Caldwell refused to appear and was held in contempt. On appeal, the Court of Appeals vacated the judgment of contempt. It said that the revealing of confidential sources of information jeopardized a First Amendment freedom and that Caldwell did not have to appear before the grand jury absent a showing that there was a "compelling and overriding national interest" in pursuing such an interrogation.

The District Court had found that Caldwell's knowledge of the activities of the Black Panthers "derived in substantial part" from information obtained "within the scope of a relationship of trust and confidence." *Id.,* at 361. It also found that confidential relationships of this sort are commonly developed and maintained by

professional journalists, and are indispensable to their work of gathering, analyzing, and publishing the news.

The District Court further had found that compelled disclosure of information received by a journalist within the scope of such confidential relationships jeopardized those relationships and thereby impaired the journalist's ability to gather, analyze, and publish the news.

The District Court, finally, had found that, without a protective order delimiting the scope of interrogation of Earl Caldwell by the grand jury, his appearance and examination before the jury would severely impair and damage his confidential relationships with members of the Black Panther Party and other militants, and thereby severely impair and damage his ability to gather, analyze, and publish news concerning them; and that it would also damage and impair the abilities of all reporters to gather, analyze, and publish news concerning them.

The Court of Appeals agreed with the findings of the District Court but held that Caldwell did not have to appear at all before the grand jury absent a "compelling need" shown by the Government. 434 F. 2d 1081.

It is my view that there is no "compelling need" that can be shown which qualifies the reporter's immunity from appearing or testifying before a grand jury, unless the reporter himself is implicated in a crime. His immunity in my view is therefore quite complete, for, absent his involvement in a crime, the First Amendment protects him against an appearance before a grand jury and if he is involved in a crime, the Fifth Amendment stands as a barrier. Since in my view there is no area of inquiry not protected by a privilege, the reporter need not appear for the futile purpose of invoking one to each question. And, since in my view a newsman has an absolute right not to appear before a grand jury, it follows for me that a journalist who voluntarily appears before that body may invoke his First Amendment privilege to specific ques-

tions. The basic issue is the extent to which the First Amendment (which is applicable to investigating committees, *Watkins* v. *United States,* 354 U. S. 178; *NAACP* v. *Alabama,* 357 U. S. 449, 463; *Gibson* v. *Florida Legislative Investigation Committee,* 372 U. S. 539; *Baird* v. *State Bar of Arizona,* 401 U. S. 1, 6–7; *In re Stolar,* 401 U. S. 23) must yield to the Government's asserted need to know a reporter's unprinted information.

The starting point for decision pretty well marks the range within which the end result lies. The New York Times, whose reporting functions are at issue here, takes the amazing position that First Amendment rights are to be balanced against other needs or conveniences of government.[1] My belief is that all of the "balancing" was done by those who wrote the Bill of Rights. By casting the First Amendment in absolute terms, they repudiated the timid, watered-down, emasculated versions of the First Amendment which both the Government and the New York Times advance in the case.

My view is close to that of the late Alexander Meiklejohn: [2]

"For the understanding of these principles it is essential to keep clear the crucial difference between 'the rights' of the governed and 'the powers' of the governors. And at this point, the title 'Bill of Rights' is lamentably inaccurate as a designation

---

[1] "The three minimal tests we contend must be met before testimony divulging confidences may be compelled from a reporter are these: 1. The government must clearly show that there is probable cause to believe that the reporter possesses information which is specifically relevant to a specific probable violation of law. 2. The government must clearly show that the information it seeks cannot be obtained by alternative means, which is to say, from sources other than the reporter. 3. The government must clearly demonstrate a compelling and overriding interest in the information." Brief for New York Times as *Amicus Curiae* 29.

[2] The First Amendment Is An Absolute, 1961 Sup. Ct. Rev. 245, 254.

of the first ten amendments. They are not a 'Bill of Rights' but a 'Bill of Powers and Rights.' The Second through the Ninth Amendments limit the powers of the subordinate agencies in order that due regard shall be paid to the private 'rights of the governed.' The First and Tenth Amendments protect the governing 'powers' of the people from abridgment by the agencies which are established as their servants. In the field of our 'rights,' each one of us can claim 'due process of law.' In the field of our governing 'powers,' the notion of 'due process' is irrelevant."

He also believed that "[s]elf-government can exist only insofar as the voters acquire the intelligence, integrity, sensitivity, and generous devotion to the general welfare that, in theory, casting a ballot is assumed to express,"[3] and that "[p]ublic discussions of public issues, together with the spreading of information and opinion bearing on those issues, must have a freedom unabridged by our agents. Though they govern us, we, in a deeper sense, govern them. Over our governing, they have no power. Over their governing we have sovereign power."[4]

Two principles which follow from this understanding of the First Amendment are at stake here. One is that the people, the ultimate governors, must have absolute freedom of, and therefore privacy of, their individual opinions and beliefs regardless of how suspect or strange they may appear to others. Ancillary to that principle is the conclusion that an individual must also have absolute privacy over whatever information he may generate in the course of testing his opinions and beliefs. In this regard, Caldwell's status as a reporter is less relevant than is his status as a student who affirmatively pursued empirical research to enlarge his own intellectual view-

---

[3] *Id.*, at 255.

[4] *Id.*, at 257.

point. The second principle is that effective self-government cannot succeed unless the people are immersed in a steady, robust, unimpeded, and uncensored flow of opinion and reporting which are continuously subjected to critique, rebuttal, and re-examination. In this respect, Caldwell's status as a news gatherer and an integral part of that process becomes critical.

I

Government has many interests that compete with the First Amendment. Congressional investigations determine how existing laws actually operate or whether new laws are needed. While congressional committees have broad powers, they are subject to the restraints of the First Amendment. As we said in *Watkins* v. *United States,* 354 U. S., at 197: "Clearly, an investigation is subject to the command that the Congress shall make no law abridging freedom of speech or press or assembly. While it is true that there is no statute to be reviewed, and that an investigation is not a law, nevertheless an investigation is part of lawmaking. It is justified solely as an adjunct to the legislative process. The First Amendment may be invoked against infringement of the protected freedoms by law or by lawmaking."

Hence, matters of belief, ideology, religious practices, social philosophy, and the like are beyond the pale and of no rightful concern of government, unless the belief or the speech, or other expression has been translated into action. *West Virginia State Board of Education* v. *Barnette,* 319 U. S. 624, 642; *Baird* v. *State Bar of Arizona,* 401 U. S., at 6–7; *In re Stolar,* 401 U. S. 23.

Also at stake here is Caldwell's privacy of association. We have held that "[i]nviolability of privacy in group association may in many circumstances be indispensable to preservation of freedom of association, particularly where a group espouses dissident beliefs." *NAACP* v.

*Alabama,* 357 U. S., at 462; *NAACP* v. *Button,* 371 U. S. 415.

As I said in *Gibson* v. *Florida Legislative Investigation Committee,* 372 U. S., at 565: "the associational rights protected by the First Amendment . . . cover the entire spectrum in political ideology as well as in art, in journalism, in teaching, and in religion. . . . [G]overnment is . . . precluded from probing the intimacies of spiritual and intellectual relationships in the myriad of such societies and groups that exist in this country, *regardless of the legislative purpose sought to be served.* . . . If that is not true, I see no barrier to investigation of newspapers, churches, political parties, clubs, societies, unions, and any other association for their political, economic, social, philosophical, or religious views." (Concurring opinion.) (Emphasis added.)

The Court has not always been consistent in its protection of these First Amendment rights and has sometimes allowed a government interest to override the absolutes of the First Amendment. For example, under the banner of the "clear and present danger" test,[5] and later under the influence of the "balancing" formula,[6] the

---

[5] *E. g., Schenck* v. *United States,* 249 U. S. 47 (wartime anti-draft "leafleting"); *Debs* v. *United States,* 249 U. S. 211 (wartime anti-draft speech); *Abrams* v. *United States,* 250 U. S. 616 (wartime leafleting calling for general strike); *Feiner* v. *New York,* 340 U. S. 315 (arrest of radical speaker without attempt to protect him from hostile audience); *Dennis* v. *United States,* 341 U. S. 494 (reformulation of test as "not improbable" rule to sustain conviction of knowing advocacy of overthrow); *Scales* v. *United States,* 367 U. S. 203 (knowing membership in group which espouses forbidden advocacy is punishable). For a more detailed account of the infamy of the "clear and present danger" test see my concurring opinion in *Brandenburg* v. *Ohio,* 395 U. S. 444, 450.

[6] *E. g., Adler* v. *Board of Education,* 342 U. S. 485 (protection of schools from "pollution" outweighs public teachers' freedom to advocate violent overthrow); *Uphaus* v. *Wyman,* 360 U. S. 72, 79, 81 (preserving security of New Hampshire from subversives

Court has permitted men to be penalized not for any harmful conduct but solely for holding unpopular beliefs.

In recent years we have said over and over again that where First Amendment rights are concerned any regulation "narrowly drawn," [7] must be "compelling" and not

outweighs privacy of list of participants in suspect summer camp); *Barenblatt* v. *United States,* 360 U. S. 109 (legislative inquiry more important than protecting HUAC witness' refusal to answer whether a third person had been a Communist); *Wilkinson* v. *United States,* 365 U. S. 399 (legislative inquiry more important than protecting HUAC witness' refusal to state whether he was currently a member of the Communist Party); *Braden* v. *United States,* 365 U. S. 431, 435 (legislative inquiry more important than protecting HUAC witness' refusal to state whether he had once been a member of the Communist Party); *Konigsberg* v. *State Bar,* 366 U. S. 36 (regulating membership of bar outweighs interest of applicants in refusing to answer question concerning Communist affiliations); *In re Anastaplo,* 366 U. S. 82 (regulating membership of bar outweighs protection of applicant's belief in Declaration of Independence that citizens should revolt against an oppressive government); *Communist Party* v. *Subversive Activities Control Board,* 367 U. S. 1 (national security outweighs privacy of association of leaders of suspect groups); *Law Students Research Council* v. *Wadmond,* 401 U. S. 154 (regulating membership of bar outweighs privacy of applicants' views on the soundness of the Constitution).

[7] Thus, we have held "overbroad" measures which unduly restricted the time, place, and manner of expression. *Schneider* v. *State,* 308 U. S. 147, 161 (anti-leafleting law); *Thornhill* v. *Alabama,* 310 U. S. 88, 102 (anti-boycott statute); *Cantwell* v. *Connecticut,* 310 U. S. 296 (breach-of-peace measure); *Cox* v. *Louisiana,* 379 U. S. 536 (breach-of-peace measure); *Edwards* v. *South Carolina,* 372 U. S. 229 (breach-of-peace statute); *Cohen* v. *California,* 403 U. S. 15, 22 (breach-of-peace statute); *Gooding* v. *Wilson,* 405 U. S. 518 (breach-of-peace statute). But insofar as penalizing the *content* of thought and opinion is concerned, the Court has not in recent Terms permitted any interest to override the absolute privacy of one's philosophy. To be sure, opinions have often adverted to the absence of a compelling justification for attempted intrusions into philosophical or associational privacy. *E. g., Bates* v. *Little Rock,* 361 U. S. 516, 523 (disclosure of NAACP membership lists to city officials); *Gibson* v. *Florida Legislative Investiga-*

merely "rational" as is the case where other activities are concerned.[8] But the "compelling" interest in regulation neither includes paring down or diluting the right, nor

*tion Committee,* 372 U. S. 539, 546 (disclosure of NAACP membership list to state legislature); *DeGregory* v. *Attorney General of New Hampshire,* 383 U. S. 825, 829 (witness' refusal to state whether he had been a member of the Communist Party three years earlier); *Baird* v. *State Bar of Arizona,* 401 U. S. 1, 6–7 (refusal of bar applicant to state whether she had been a member of the Communist Party); *In re Stolar,* 401 U. S. 23 (refusal of bar applicant to state whether he was "loyal" to the Government); see also *Street* v. *New York,* 394 U. S. 576 (expression of disgust for flag). Yet, while the rhetoric of these opinions did not expressly embrace an absolute privilege for the privacy of opinions and philosophy, the trend of those results was not inconsistent with and in their totality appeared to be approaching such a doctrine. Moreover, in another group of opinions invalidating for overbreadth intrusions into the realm of belief and association, there was no specification of whether a danger test, a balancing process, an absolute doctrine, or a compelling justification inquiry had been used to detect invalid applications comprehended by the challenged measures. *E. g., Wieman* v. *Updegraff,* 344 U. S. 183 (loyalty test which condemned mere unknowing membership in a suspect group); *Shelton* v. *Tucker,* 364 U. S. 479 (requirement that public teachers disclose all affiliations); *Louisiana ex rel. Gremillion* v. *NAACP,* 366 U. S. 293, 296 (disclosure of NAACP membership lists); *Whitehill* v. *Elkins,* 389 U. S. 54, 59 (nonactive membership in a suspect group a predicate for refusing employment as a public teacher); *United States* v. *Robel,* 389 U. S. 258 (mere membership in Communist Party a sole ground for exclusion from employment in defense facility). Regrettably, the vitality of the overdue trend toward a complete privilege in this area has been drawn into question by quite recent decisions of the Court, *Law Students Research Council* v. *Wadmond,* 401 U. S. 154, holding that bar applicants may be turned away for refusing to disclose their opinions on the soundness of the Constitution; *Cole* v. *Richardson,* 405 U. S. 676, sustaining an oath required of public employees that they will "oppose" a violent overthrow; and, of course, by today's decision.

[8] Where no more than economic interests were affected this Court has upheld legislation only upon a showing that it was "rationally connected" to some permissible state objective. *E. g.,*

embraces penalizing one solely for his intellectual view-point; it concerns the State's interest, for example, in regulating the time and place or perhaps manner of exercising First Amendment rights. Thus, one has an undoubted right to read and proclaim the First Amendment in the classroom or in a park. But he would not have the right to blare it forth from a sound truck rolling through the village or city at 2 a. m. The distinction drawn in *Cantwell* v. *Connecticut,* 310 U. S. 296, 303–304, should still stand: "[T]he Amendment embraces two concepts,—freedom to believe and freedom to act. The first is absolute but, in the nature of things, the second cannot be." [9]

Under these precedents there is no doubt that Caldwell could not be brought before the grand jury for the sole purpose of exposing his political beliefs. Yet today the Court effectively permits that result under the guise of allowing an attempt to elicit from him "factual information." To be sure, the inquiry will be couched only in terms of extracting Caldwell's recollection of what was said to him during the interviews, but the fact remains that his questions to the Panthers and therefore the respective answers were guided by Caldwell's own preconceptions and views about the Black Panthers. His

---

*United States* v. *Carolene Products Co.,* 304 U. S. 144, 152; *Goesaert* v. *Cleary,* 335 U. S. 464; *Williamson* v. *Lee Optical Co.,* 348 U. S. 483; *McGowan* v. *Maryland,* 366 U. S. 420; *McDonald* v. *Board of Election Comm'rs,* 394 U. S. 802; *United States* v. *Maryland Savings-Share Ins. Corp.,* 400 U. S. 4; *Richardson* v. *Belcher,* 404 U. S. 78; *Schilb* v. *Kuebel,* 404 U. S. 357.

[9] The majority cites several cases which held that certain burdens on the press were permissible despite incidental burdens on its news-gathering ability. For example, see *Sheppard* v. *Maxwell,* 384 U. S. 333, 358. Even assuming that those cases were rightly decided, the fact remains that in none of them was the Government attempting to extract personal belief from a witness and the privacy of a citizen's personal intellectual viewpoint was not implicated.

entire experience was shaped by his intellectual view-point.  Unlike the random bystander, those who affirm-atively set out to test a hypothesis, as here, have no tidy means of segregating subjective opinion from ob-jective facts.

Sooner or later, any test which provides less than blanket protection to beliefs and associations will be twisted and relaxed so as to provide virtually no pro-tection at all.  As Justice Holmes noted in *Abrams* v. *United States,* 250 U. S. 616, 624, such was the fate of the "clear and present danger" test which he had coined in *Schenck* v. *United States,* 249 U. S. 47.  Eventually, that formula was so watered down that the danger had to be neither clear nor present but merely "not improb-able." *Dennis* v. *United States,* 341 U. S. 494, 510. See my concurring opinion in *Brandenburg* v. *Ohio,* 395 U. S. 444, 450.  A compelling-interest test may prove as pliable as did the clear-and-present-danger test. Perceptions of the worth of state objectives will change with the composition of the Court and with the intensity of the politics of the times.  For example, in *Uphaus* v. *Wyman,* 360 U. S. 72, sustaining an attempt to compel a witness to divulge the names of participants in a summer political camp, JUSTICE BRENNAN dissented on the ground that "it is patent that there is really no subordinating interest . . . demonstrated on the part of the State." *Id.,* at 106.  The majority, however, found that "the governmental interest in self-preservation is sufficiently compelling to subordinate the interest in as-sociational privacy . . . ." *Id.,* at 81.  That is to enter the world of "make believe," for New Hampshire, the State involved in *Uphaus,* was never in fear of being overthrown.

## II

Today's decision will impede the wide-open and ro-bust dissemination of ideas and counterthought which

a free press both fosters and protects and which is essential to the success of intelligent self-government. Forcing a reporter before a grand jury will have two retarding effects upon the ear and the pen of the press. Fear of exposure will cause dissidents to communicate less openly to trusted reporters. And, fear of accountability will cause editors and critics to write with more restrained pens.

I see no way of making mandatory the disclosure of a reporter's confidential source of the information on which he bases his news story.

The press has a preferred position in our constitutional scheme, not to enable it to make money, not to set newsmen apart as a favored class, but to bring fulfillment to the public's right to know. The right to know is crucial to the governing powers of the people, to paraphrase Alexander Meiklejohn. Knowledge is essential to informed decisions.

As Mr. Justice Black said in *New York Times Co.* v. *United States,* 403 U. S. 713, 717 (concurring opinion), "The press was to serve the governed, not the governors. . . . The press was protected so that it could bare the secrets of government and inform the people."

Government has an interest in law and order; and history shows that the trend of rulers—the bureaucracy and the police—is to suppress the radical and his ideas and to arrest him rather than the hostile audience. See *Feiner* v. *New York,* 340 U. S. 315. Yet, as held in *Terminiello* v. *Chicago,* 337 U. S. 1, 4, one "function of free speech under our system of government is to invite dispute." We went on to say, "It may indeed best serve its high purpose when it induces a condition of unrest, creates dissatisfaction with conditions as they are, or even stirs people to anger. Speech is often provocative and challenging. It may strike at prejudices and pre-

conceptions and have profound unsettling effects as it presses for acceptance of an idea."

The people who govern are often far removed from the cabals that threaten the regime; the people are often remote from the sources of truth even though they live in the city where the forces that would undermine society operate. The function of the press is to explore and investigate events, inform the people what is going on, and to expose the harmful as well as the good influences at work. There is no higher function performed under our constitutional regime. Its performance means that the press is often engaged in projects that bring anxiety or even fear to the bureaucracies, departments, or officials of government. The whole weight of government is therefore often brought to bear against a paper or a reporter.

A reporter is no better than his source of information. Unless he has a privilege to withhold the identity of his source, he will be the victim of governmental intrigue or aggression. If he can be summoned to testify in secret before a grand jury, his sources will dry up and the attempted exposure, the effort to enlighten the public, will be ended. If what the Court sanctions today becomes settled law, then the reporter's main function in American society will be to pass on to the public the press releases which the various departments of government issue.

It is no answer to reply that the risk that a newsman will divulge one's secrets to the grand jury is no greater than the threat that he will in any event inform to the police. Even the most trustworthy reporter may not be able to withstand relentless badgering before a grand jury.[10]

---

[10] "The secrecy of the [grand jury's] proceedings and the possibility of a jail sentence for contempt so intimidate the witness that he may be led into answering questions which pry into his personal

The record in this case is replete with weighty affidavits from responsible newsmen, telling how important is the sanctity of their sources of information.[11]   When we deny newsmen that protection, we deprive the people of the information needed to run the affairs of the Nation in an intelligent way.

Madison said:

> "A popular Government, without popular information, or the means of acquiring it, is but a Prologue to a Farce or a Tragedy; or, perhaps both. Knowledge will forever govern ignorance: And a people who mean to be their own Governors, must arm themselves with the power which knowledge gives." (To W. T. Barry, Aug. 4, 1822.)   9 Writings of James Madison 103 (G. Hunt ed. 1910).

life and associations and which, in the bargain, are frequently immaterial and vague.   Alone and faced by either hostile or apathetic grand juries, the witness is frequently undone by his experience. Life in a relatively open society makes him especially vulnerable to a secret appearance before a body that is considering criminal charges. And the very body toward which he could once look for protection has become a weapon of the prosecution.   When he seeks protective guidance from his lawyer he learns that the judicial broadening of due process which has occurred in the past two decades has largely ignored grand jury matters, precisely because it was assumed that the grand jury still functioned as a guardian of the rights of potential defendants."   Donner & Cerruti, The Grand Jury Network: How the Nixon Administration Has Secretly Perverted A Traditional Safeguard of Individual Rights, 214 The Nation 5, 6 (1972).

[11] It is said that "we remain unclear how often and to what extent informers are actually deterred from furnishing information when newsmen are forced to testify before a grand jury." *Ante,* at 693. But the majority need look no further than its holdings that prosecutors need not disclose informers' names because disclosure would (a) terminate the usefulness of an exposed informant inasmuch as others would no longer confide in him, and (b) it would generally inhibit persons from becoming confidential informers. *McCray* v. *Illinois,* 386 U. S. 300; *Scher* v. *United States,* 305 U. S. 251; cf. *Roviaro* v. *United States,* 353 U. S. 53.

Today's decision is more than a clog upon news, gathering. It is a signal to publishers and editors that they should exercise caution in how they use whatever information they can obtain. Without immunity they may be summoned to account for their criticism. Entrenched officers have been quick to crash their powers down upon unfriendly commentators.[12] *E. g., New York Times Co. v. Sullivan*, 376 U. S. 254; *Garrison* v. *Louisiana*, 379 U. S. 64; *Pickering* v. *Board of Education*, 391 U. S. 563; *Gravel* v. *United States, ante*, p. 606.

The intrusion of government into this domain is symptomatic of the disease of this society. As the years pass the power of government becomes more and more pervasive. It is a power to suffocate both people and causes. Those in power, whatever their politics, want only to per-

---

[12] For a summary of early reprisals against the press, such as the John Peter Zenger trial, the Alien and Sedition Acts prosecutions, and Civil War suppression of newspapers, see Press Freedoms Under Pressure, Report of the Twentieth Century Fund Task Force on the Government and the Press 3–5 (1972). We have not outlived the tendency of officials to retaliate against critics. For recent examples see J. Wiggins, Freedom or Secrecy 87 (1956) ("New Mexico, in 1954, furnished a striking example of government reprisal against . . . a teacher in the state reform school [who] wrote a letter to the *New Mexican*, confirming stories it had printed about mistreatment of inmates by guards. . . . [Two days later he] was notified of his dismissal."); Note, The Right of Government Employees to Furnish Information to Congress: Statutory and Constitutional Aspects, 57 Va. L. Rev. 885–886 (1971) (dismissal of an Air Force employee who testified before a Senate committee with respect to C-5A cargo plane cost overruns and firing of an FBI agent who wrote Senators complaining of the Bureau's personnel practices); N. Y. Times, Nov. 8, 1967, p. 1, col. 2; *id.*, Nov. 9, 1967, p. 2, col. 4 (Selective Service directive to local draft boards requiring conscription of those who protested war); N. Y. Times, Nov. 11, 1971, p. 95, col. 4; *id.*, Nov. 12, 1971, p. 13, col. 1; *id.*, Nov. 14, 1971, pt. 4, p. 13, col. 1 (FBI investigation of a television commentator who criticized administration policies); *id.*, Nov. 14, 1971, p. 75, col. 3 (denial of White House press pass to underground journalist).

petuate it. Now that the fences of the law and the tradition that has protected the press are broken down, the people are the victims. The First Amendment, as I read it, was designed precisely to prevent that tragedy.

I would also reverse the judgments in No. 70–85, *Branzburg* v. *Hayes,* and No. 70–94, *In re Pappas,* for the reasons stated in the above dissent in No. 70–57, *United States* v. *Caldwell.*

MR. JUSTICE STEWART, with whom MR. JUSTICE BRENNAN and MR. JUSTICE MARSHALL join, dissenting.

The Court's crabbed view of the First Amendment reflects a disturbing insensitivity to the critical role of an independent press in our society. The question whether a reporter has a constitutional right to a confidential relationship with his source is of first impression here, but the principles that should guide our decision are as basic as any to be found in the Constitution. While MR. JUSTICE POWELL's enigmatic concurring opinion gives some hope of a more flexible view in the future, the Court in these cases holds that a newsman has no First Amendment right to protect his sources when called before a grand jury. The Court thus invites state and federal authorities to undermine the historic independence of the press by attempting to annex the journalistic profession as an investigative arm of government. Not only will this decision impair performance of the press' constitutionally protected functions, but it will, I am convinced, in the long run harm rather than help the administration of justice.

I respectfully dissent.

I

The reporter's constitutional right to a confidential relationship with his source stems from the broad societal interest in a full and free flow of information to the public. It is this basic concern that underlies the Con-

stitution's protection of a free press, *Grosjean* v. *American Press Co.*, 297 U. S. 233, 250; *New York Times Co.* v. *Sullivan*, 376 U. S. 254, 269,[1] because the guarantee is "not for the benefit of the press so much as for the benefit of all of us." *Time, Inc.* v. *Hill*, 385 U. S. 374, 389.[2]

Enlightened choice by an informed citizenry is the basic ideal upon which an open society is premised,[3] and a free press is thus indispensable to a free society. Not only does the press enhance personal self-fulfillment

---

[1] We have often described the process of informing the public as the core purpose of the constitutional guarantee of free speech and a free press. See, *e. g., Stromberg* v. *California*, 283 U. S. 359, 369; *De Jonge* v. *Oregon*, 299 U. S. 353, 365; *Smith* v. *California*, 361 U. S. 147, 153.

[2] As I see it, a reporter's right to protect his source is bottomed on the constitutional guarantee of a full flow of information to the public. A newsman's personal First Amendment rights or the associational rights of the newsman and the source are subsumed under that broad societal interest protected by the First Amendment. Obviously, we are not here concerned with the parochial personal concerns of particular newsmen or informants.

"The newsman-informer relationship is different from . . . other relationships whose confidentiality is protected by statute, such as the attorney-client and physician-patient relationships. In the case of other statutory privileges, the right of nondisclosure is granted to the person making the communication in order that he will be encouraged by strong assurances of confidentiality to seek such relationships which contribute to his personal well-being. The judgment is made that the interests of society will be served when individuals consult physicians and lawyers; the public interest is thus advanced by creating a zone of privacy that the individual can control. However, in the case of the reporter-informer relationship, society's interest is not in the welfare of the informant per se, but rather in creating conditions in which information possessed by news sources can reach public attention." Note, 80 Yale L. J. 317, 343 (1970) (footnotes omitted) (hereinafter Yale Note).

[3] See generally Z. Chafee, Free Speech in the United States (1941); A. Meikeljohn, Free Speech and Its Relation to Self-Government (1948); T. Emerson, Toward a General Theory of the First Amendment (1963).

by providing the people with the widest possible range of fact and opinion, but it also is an incontestable precondition of self-government. The press "has been a mighty catalyst in awakening public interest in governmental affairs, exposing corruption among public officers and employees and generally informing the citizenry of public events and occurrences . . . ." *Estes* v. *Texas,* 381 U. S. 532, 539; *Mills* v. *Alabama,* 384 U. S. 214, 219; *Grosjean, supra,* at 250. As private and public aggregations of power burgeon in size and the pressures for conformity necessarily mount, there is obviously a continuing need for an independent press to disseminate a robust variety of information and opinion through reportage, investigation, and criticism, if we are to preserve our constitutional tradition of maximizing freedom of choice by encouraging diversity of expression.

## A

In keeping with this tradition, we have held that the right to publish is central to the First Amendment and basic to the existence of constitutional democracy. *Grosjean, supra,* at 250; *New York Times, supra,* at 270.

A corollary of the right to publish must be the right to gather news. The full flow of information to the public protected by the free-press guarantee would be severely curtailed if no protection whatever were afforded to the process by which news is assembled and disseminated. We have, therefore, recognized that there is a right to publish without prior governmental approval, *Near* v. *Minnesota,* 283 U. S. 697; *New York Times Co.* v. *United States,* 403 U. S. 713, a right to distribute information, see, *e. g., Lovell* v. *Griffin,* 303 U. S. 444, 452; *Marsh* v. *Alabama,* 326 U. S. 501; *Martin* v. *City of Struthers,* 319 U. S. 141; *Grosjean, supra,* and a right to receive printed matter, *Lamont* v. *Postmaster General,* 381 U. S. 301.

No less important to the news dissemination process is the gathering of information. News must not be unnecessarily cut off at its source, for without freedom to acquire information the right to publish would be impermissibly compromised. Accordingly, a right to gather news, of some dimensions, must exist. *Zemel* v. *Rusk,* 381 U. S. 1.[4] Note, The Right of the Press to Gather Information, 71 Col. L. Rev. 838 (1971). As Madison wrote: "A popular Government, without popular information, or the means of acquiring it, is but a Prologue to a Farce or a Tragedy; or, perhaps both." 9 Writings of James Madison 103 (G. Hunt ed. 1910).

## B

The right to gather news implies, in turn, a right to a confidential relationship between a reporter and his source. This proposition follows as a matter of simple logic once three factual predicates are recognized: (1) newsmen require informants to gather news; (2) confidentiality—the promise or understanding that names or certain aspects of communications will be kept off the record—is essential to the creation and maintenance of a news-gathering relationship with informants; and (3) an unbridled subpoena power—the absence of a constitutional right protecting, in *any* way, a confidential relationship from compulsory process—will either deter sources from divulging information or deter reporters from gathering and publishing information.

---

[4] In *Zemel* v. *Rusk*, 381 U. S. 1, we held that the Secretary of State's denial of a passport for travel to Cuba did not violate a citizen's First Amendment rights. The rule was justified by the "weightiest considerations of national security" and we concluded that the "right to speak and publish does not carry with it the *unrestrained* right to gather information." *Id.*, at 16–17 (emphasis supplied). The necessary implication is that some right to gather information does exist.

It is obvious that informants are necessary to the news-gathering process as we know it today. If it is to perform its constitutional mission, the press must do far more than merely print public statements or publish prepared handouts. Familiarity with the people and circumstances involved in the myriad background activities that result in the final product called "news" is vital to complete and responsible journalism, unless the press is to be a captive mouthpiece of "newsmakers." [5]

It is equally obvious that the promise of confidentiality may be a necessary prerequisite to a productive relationship between a newsman and his informants. An officeholder may fear his superior; a member of the bureaucracy, his associates; a dissident, the scorn of majority opinion. All may have information valuable to the public discourse, yet each may be willing to relate that information only in confidence to a reporter whom he trusts, either because of excessive caution or because of a reasonable fear of reprisals or censure for unorthodox

---

[5] In *Caldwell* v. *United States,* 434 F. 2d 1081, the Government claimed that Caldwell did not have to maintain a confidential relationship with members of the Black Panther Party and provide independent reporting of their activities, since the Party and its leaders could issue statements on their own. But, as the Court of Appeals for the Ninth Circuit correctly observed:

"[I]t is not enough that Black Panther press releases and public addresses by Panther leaders may continue unabated in the wake of subpoenas such as the one here in question. It is not enough that the public's knowledge of groups such as the Black Panthers should be confined to their deliberate public pronouncements or distant news accounts of their occasional dramatic forays into the public view.

"The need for an untrammeled press takes on special urgency in times of widespread protest and dissent. In such times the First Amendment protections exist to maintain communication with dissenting groups and to provide the public with a wide range of information about the nature of protest and heterodoxy." Citing *Associated Press* v. *United States,* 326 U. S. 1, 20; *Thornhill* v. *Alabama,* 310 U. S. 88, 102. *Id.,* at 1084–1085.

views.   The First Amendment concern must not be with the motives of any particular news source, but rather with the conditions in which informants of all shades of the spectrum may make information available through the press to the public.   Cf. *Talley* v. *California,* 362 U. S. 60, 65; *Bates* v. *Little Rock,* 361 U. S. 516; *NAACP* v. *Alabama,* 357 U. S. 449.[6]

In *Caldwell,* the District Court found that "confidential relationships . . . are commonly developed and maintained by professional journalists, and are indispensable to their work of gathering, analyzing and publishing the news."[7]   Commentators and individual reporters have repeatedly noted the importance of confidentiality.[8]

---

[6] As we observed in *Talley* v. *California,* 362 U. S. 60, "Anonymous pamphlets, leaflets, brochures and even books have played an important role in the progress of mankind. . . . Before the Revolutionary War colonial patriots frequently had to conceal their authorship or distribution of literature that easily could have brought down on them prosecutions by English-controlled courts. . . . Even the Federalist Papers, written in favor of the adoption of our Constitution, were published under fictitious names. It is plain that anonymity has sometimes been assumed for the most constructive purposes." *Id.,* at 64–65. And in *Lamont* v. *Postmaster General,* 381 U. S. 301, we recognized the importance to First Amendment values of the right to receive information anonymously.

[7] *Application of Caldwell,* 311 F. Supp. 358, 361.

[8] See, *e. g.,* F. Chalmers, A Gentleman of the Press: The Biography of Colonel John Bayne MacLean 74–75 (1969); H. Klurfeld, Behind the Lines: The World of Drew Pearson 50, 52–55 (1968); A. Krock, Memoirs: Sixty Years on the Firing Line 181, 184–185 (1968); E. Larsen, First with the Truth 22–23 (1968); R. Ottley, The Lonely Warrior—The Life and Times of Robert S. Abbott 143–145 (1955); C. Sulzberger, A Long Row of Candles; Memoirs and Diaries 241 (1969).

As Walter Cronkite, a network television reporter, said in an affidavit in *Caldwell:* "In doing my work, I (and those who assist me) depend constantly on information, ideas, leads and opinions received in confidence. Such material is essential in digging out newsworthy facts and, equally important, in assessing the importance and analyzing the significance of public events." App. 52.

And surveys among reporters and editors indicate that the promise of nondisclosure is necessary for many types of news gathering.[9]

Finally, and most important, when governmental officials possess an unchecked power to compel newsmen to disclose information received in confidence, sources will clearly be deterred from giving information, and reporters will clearly be deterred from publishing it, because uncertainty about exercise of the power will lead to "self-censorship." *Smith* v. *California,* 361 U. S. 147, 149–154; *New York Times Co.* v. *Sullivan,* 376 U. S., at 279. The uncertainty arises, of course, because the judiciary has traditionally imposed virtually no limitations on the grand jury's broad investigatory powers. See Antell, The Modern Grand Jury: Benighted Supergovernment, 51 A. B. A. J. 153 (1965). See also Part II, *infra.*

After today's decision, the potential informant can never be sure that his identity or off-the-record communications will not subsequently be revealed through the compelled testimony of a newsman. A public-spirited person inside government, who is not implicated in any crime, will now be fearful of revealing corruption or other governmental wrongdoing, because he will now know he can subsequently be identified by use of compulsory process. The potential source must, therefore, choose between risking exposure by giving information or avoiding the risk by remaining silent.

The reporter must speculate about whether contact with a controversial source or publication of controversial material will lead to a subpoena. In the event of a

---

[9] See Guest & Stanzler, The Constitutional Argument for Newsmen Concealing Their Sources, 64 Nw. U. L. Rev. 18 (1969); V. Blasi, Press Subpoenas: An Empirical and Legal Analysis, Study Report of the Reporters' Committee on Freedom of the Press 20–29 (hereinafter Blasi).

subpoena, under today's decision, the newsman will know that he must choose between being punished for contempt if he refuses to testify, or violating his profession's ethics [10] and impairing his resourcefulness as a reporter if he discloses confidential information.[11]

Again, the commonsense understanding that such deterrence will occur is buttressed by concrete evidence. The existence of deterrent effects through fear and self-censorship was impressively developed in the District Court in *Caldwell*.[12] Individual reporters [13] and commentators [14] have noted such effects. Surveys have verified that an unbridled subpoena power will substan-

---

[10] The American Newspaper Guild has adopted the following rule as part of the newsman's code of ethics: "[N]ewspapermen shall refuse to reveal confidences or disclose sources of confidential information in court or before other judicial or investigating bodies." G. Bird & F. Merwin, The Press and Society 592 (1971).

[11] Obviously, if a newsman does not honor a confidence he will have difficulty establishing other confidential relationships necessary for obtaining information in the future. See Siebert & Ryniker, Press Winning Fight to Guard Sources, Editor & Publisher, Sept. 1, 1934, pp. 9, 36–37.

[12] The court found that "compelled disclosure of information received by a journalist within the scope of . . . confidential relationships jeopardizes those relationships and thereby impairs the journalist's ability to gather, analyze and publish the news." *Application of Caldwell*, 311 F. Supp., at 361.

[13] See n. 8, *supra*.

[14] Recent commentary is nearly unanimous in urging either an absolute or qualified newsman's privilege. See, *e. g.*, Goldstein, Newsmen and Their Confidential Sources, New Republic, Mar. 21, 1970, pp. 13–14; Yale Note, *supra*, n. 2; Comment, 46 N. Y. U. L. Rev. 617 (1971); Nelson, The Newsmen's Privilege Against Disclosure of Confidential Sources and Information, 24 Vand. L. Rev. 667 (1971); Note, The Right of the Press to Gather Information, 71 Col. L. Rev. 838 (1971); Comment, 4 U. Mich. J. L. Ref. 85 (1970); Comment, 6 Harv. Civ. Rights-Civ. Lib. L. Rev. 119 (1970); Comment, The Newsman's Privilege: Government Investigations, Criminal Prosecutions and Private Litigation, 58 Calif. L. Rev. 1198 (1970). But see the Court's opinion, *ante*,

tially impair the flow of news to the public, especially in sensitive areas involving governmental officials, financial affairs, political figures, dissidents, or minority groups that require in-depth, investigative reporting.[15] And the Justice Department has recognized that "compulsory process in some circumstances may have a limiting effect on the exercise of First Amendment rights." [16] No evidence contradicting the existence of such deterrent effects was offered at the trials or in the briefs here by the petitioner in *Caldwell* or by the respondents in *Branzburg* and *Pappas.*

The impairment of the flow of news cannot, of course, be proved with scientific precision, as the Court seems to demand. Obviously, not every news-gathering relationship requires confidentiality. And it is difficult to pinpoint precisely how many relationships do require a promise or understanding of nondisclosure. But we have never before demanded that First Amendment rights rest on elaborate empirical studies demonstrating beyond any conceivable doubt that deterrent effects exist; we have never before required proof of the exact number of people potentially affected by governmental action, who would actually be dissuaded from engaging in First Amendment activity.

Rather, on the basis of common sense and available information, we have asked, often implicitly, (1) whether there was a rational connection between the cause (the governmental action) and the effect (the deterrence or

at 690 n. 29. And see generally articles collected in Yale Note, *supra,* n. 2.

Recent decisions are in conflict both as to the importance of the deterrent effects and, *a fortiori,* as to the existence of a constitutional right to a confidential reporter-source relationship. See the Court's opinion, *ante,* at 686, and cases collected in Yale Note, at 318 nn. 6–7.

[15] See Blasi 6–71; Guest & Stanzler, *supra,* n. 9, at 43–50.

[16] Department of Justice Memo. No. 692 (Sept. 2, 1970).

impairment of First Amendment activity), and (2) whether the effect would occur with some regularity, *i. e.*, would not be *de minimis*. See, *e. g., Grosjean* v. *American Press Co.,* 297 U. S., at 244–245; *Burstyn, Inc.* v. *Wilson,* 343 U. S. 495, 503; *Sweezy* v. *New Hampshire,* 354 U. S. 234, 248 (plurality opinion); *NAACP* v. *Alabama,* 357 U. S., at 461–466; *Smith* v. *California,* 361 U. S., at 150–154; *Bates* v. *Little Rock,* 361 U. S., at 523–524; *Talley* v. *California,* 362 U. S., at 64–65; *Shelton* v. *Tucker,* 364 U. S. 479, 485–486; *Cramp* v. *Board of Public Instruction,* 368 U. S. 278, 286; *NAACP* v. *Button,* 371 U. S. 415, 431–438; *Gibson* v. *Florida Legislative Investigation Committee,* 372 U. S. 539, 555–557; *New York Times Co.* v. *Sullivan,* 376 U. S., at 277–278; *Freedman* v. *Maryland,* 380 U. S. 51, 59; *DeGregory* v. *New Hampshire Attorney General,* 383 U. S. 825; *Elfbrandt* v. *Russell,* 384 U. S. 11, 16–19. And, in making this determination, we have shown a special solicitude towards the "indispensable liberties" protected by the First Amendment, *NAACP* v. *Alabama, supra,* at 461; *Bantam Books, Inc.* v. *Sullivan,* 372 U. S. 58, 66, for "[f]reedoms such as these are protected not only against heavy-handed frontal attack, but also from being stifled by more subtle governmental interference." *Bates, supra,* at 523.[17] Once this threshold inquiry has been satisfied, we have then examined the competing interests in determining whether

---

[17] Although, as the Court points out, we have held that the press is not free from the requirements of the National Labor Relations Act, the Fair Labor Standards Act, the antitrust laws, or nondiscriminatory taxation, *ante,* at 683, these decisions were concerned "only with restraints on certain business or commercial practices" of the press. *Citizen Publishing Co.* v. *United States,* 394 U. S. 131, 139. And due weight was given to First Amendment interests. For example, "The First Amendment, far from providing an argument against application of the Sherman Act . . . provides powerful reasons to the contrary." *Associated Press* v. *United States,* 326 U. S., at 20.

there is an unconstitutional infringement of First Amendment freedoms.

For example, in *NAACP* v. *Alabama, supra,* we found that compelled disclosure of the names of those in Alabama who belonged to the NAACP "is likely to affect adversely the ability [of the NAACP] and its members to pursue their . . . beliefs which they admittedly have the right to advocate, in that it may induce members to withdraw from the Association and dissuade others from joining it because of fear of exposure of their beliefs shown through their associations and of the consequences of this exposure." *Id.,* at 462–463. In *Talley, supra,* we held invalid a city ordinance that forbade circulation of any handbill that did not have the distributor's name on it, for there was "no doubt that such an identification requirement would tend to restrict freedom to distribute information and thereby freedom of expression." *Id.,* at 64. And in *Burstyn, Inc., supra,* we found deterrence of First Amendment activity inherent in a censor's power to exercise unbridled discretion under an overbroad statute. *Id.,* at 503.

Surely the analogous claim of deterrence here is as securely grounded in evidence and common sense as the claims in the cases cited above, although the Court calls the claim "speculative." See *ante,* at 694. The deterrence may not occur in every confidential relationship between a reporter and his source.[18] But it will cer-

---

[18] The fact that *some* informants will not be deterred from giving information by the prospect of the unbridled exercise of the subpoena power only means that there will not *always* be a conflict between the grand jury's inquiry and the protection of First Amendment activities. But even if the percentage of such informants is relatively large compared to the total "universe" of potential informants, there will remain a large number of people in "absolute" terms who *will* be deterred, and the flow of news through mass circulation newspapers and electronic media will inevitably be impaired.

tainly occur in certain types of relationships involving sensitive and controversial matters. And such relationships are vital to the free flow of information.

To require any greater burden of proof is to shirk our duty to protect values securely embedded in the Constitution. We cannot await an unequivocal—and therefore unattainable—imprimatur from empirical studies.[19] We can and must accept the evidence developed in the record, and elsewhere, that overwhelmingly supports the premise that deterrence will occur with regularity in important types of news-gathering relationships.[20]

Thus, we cannot escape the conclusion that when neither the reporter nor his source can rely on the shield of confidentiality against unrestrained use of the grand jury's subpoena power, valuable information will not be published and the public dialogue will inevitably be impoverished.

## II

Posed against the First Amendment's protection of the newsman's confidential relationships in these cases is society's interest in the use of the grand jury to ad-

---

[19] Empirical studies, after all, can only provide facts. It is the duty of courts to give legal significance to facts; and it is the special duty of this Court to understand the constitutional significance of facts. We must often proceed in a state of less than perfect knowledge, either because the facts are murky or the methodology used in obtaining the facts is open to question. It is then that we must look to the Constitution for the values that inform our presumptions. And the importance to our society of the full flow of information to the public has buttressed this Court's historic presumption in favor of First Amendment values.

[20] See, e. g., the uncontradicted evidence presented in affidavits from newsmen in *Caldwell*, Appendix to No. 70–57, pp. 22–61 (statements from Gerald Fraser, Thomas Johnson, John Kifner, Timothy Knight, Nicholas Proffitt, Anthony Ripley, Wallace Turner, Gilbert Noble, Anthony Lukas, Martin Arnold, David Burnham, Jon Lowell, Frank Morgan, Min Yee, Walter Cronkite, Eric Sevareid, Mike Wallace, Dan Rather, Marvin Kalb).

minister justice fairly and effectively. The grand jury serves two important functions: "to examine into the commission of crimes" and "to stand between the prosecutor and the accused, and to determine whether the charge was founded upon credible testimony or was dictated by malice or personal ill will." *Hale* v. *Henkel,* 201 U. S. 43, 59. And to perform these functions the grand jury must have available to it every man's relevant evidence. See *Blair* v. *United States,* 250 U. S. 273, 281; *Blackmer* v. *United States,* 284 U. S. 421, 438.

Yet the longstanding rule making every person's evidence available to the grand jury is not absolute. The rule has been limited by the Fifth Amendment,[21] the Fourth Amendment,[22] and the evidentiary privileges of the common law.[23] So it was that in *Blair, supra,* after recognizing that the right against compulsory self-incrimination prohibited certain inquiries, the Court noted that "some confidential matters are shielded from considerations of policy, and perhaps in other cases for *special reasons* a witness may be excused from telling all that he knows." *Id.,* at 281 (emphasis supplied). And in *United States* v. *Bryan,* 339 U. S. 323, the Court observed that any exemption from the duty to testify before the grand jury "presupposes a very real interest to be protected." *Id.,* at 332.

Such an interest must surely be the First Amendment protection of a confidential relationship that I have discussed above in Part I. As noted there, this protection does not exist for the purely private interests of the

---

[21] See *Blau* v. *United States,* 340 U. S. 159; *Quinn* v. *United States,* 349 U. S. 155; *Curcio* v. *United States,* 354 U. S. 118; *Malloy* v. *Hogan,* 378 U. S. 1.

[22] See *Silverthorne Lumber Co.* v. *United States,* 251 U. S. 385.

[23] See Committee on Rules of Practice and Procedure of Judicial Conference of the United States, Revised Draft of Proposed Rules of Evidence for the United States Courts and Magistrates (1971); 8 J. Wigmore, Evidence §§ 2290–2391 (McNaughton rev. 1961).

newsman or his informant, nor even, at bottom, for the First Amendment interests of either partner in the news-gathering relationship.[24]  Rather, it functions to insure nothing less than democratic decisionmaking through the free flow of information to the public, and it serves, thereby, to honor the "profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open." *New York Times Co.* v. *Sullivan,* 376 U. S., at 270.

In striking the proper balance between the public interest in the efficient administration of justice and the First Amendment guarantee of the fullest flow of information, we must begin with the basic proposition that because of their "delicate and vulnerable" nature, *NAACP* v. *Button,* 371 U. S., at 433, and their transcendent importance for the just functioning of our society, First Amendment rights require special safeguards.

## A

This Court has erected such safeguards when government, by legislative investigation or other investigative means, has attempted to pierce the shield of privacy inherent in freedom of association.[25]  In no previous case have we considered the extent to which the First Amendment limits the grand jury subpoena power.  But the

---

[24] Although there is a longstanding presumption against creation of common-law testimonial privileges, *United States* v. *Bryan,* 339 U. S. 323, these privileges are grounded in an "individual interest which has been found . . . to outweigh the public interest in the search for truth" rather than in the broad public concerns that inform the First Amendment. *Id.,* at 331.

[25] The protection of information from compelled disclosure for broad purposes of public policy has been recognized in decisions involving police informers, see *Roviaro* v. *United States,* 353 U. S. 53, *United States* v. *Ventresca,* 380 U. S. 102, 108, *Aguilar* v. *Texas,* 378 U. S. 108, 114, *McCray* v. *Illinois,* 386 U. S. 300, and military and state secrets, *United States* v. *Reynolds,* 345 U. S. 1.

Court has said that "[t]he Bill of Rights is applicable to investigations as to all forms of governmental action. Witnesses cannot be compelled to give evidence against themselves. They cannot be subjected to unreasonable search and seizure. Nor can the First Amendment freedoms of speech, press . . . or political belief and association be abridged." *Watkins* v. *United States,* 354 U. S. 178, 188. And in *Sweezy* v. *New Hampshire* it was stated: "It is particularly important that the exercise of the power of compulsory process be carefully circumscribed when the investigative process tends to impinge upon such highly sensitive areas as freedom of speech or press, freedom of political association, and freedom of communication of ideas." 354 U. S., at 245 (plurality opinion).

The established method of "carefully" circumscribing investigative powers is to place a heavy burden of justification on government officials when First Amendment rights are impaired. The decisions of this Court have "consistently held that only a compelling state interest in the regulation of a subject within the State's constitutional power to regulate can justify limiting First Amendment freedoms." *NAACP* v. *Button,* 371 U. S., at 438. And "it is an essential prerequisite to the validity of an investigation which intrudes into the area of constitutionally protected rights of speech, press, association and petition that the State convincingly *show a substantial relation between the information sought and a subject of overriding and compelling state interest.*" *Gibson* v. *Florida Legislative Investigation Committee,* 372 U. S., at 546 (emphasis supplied). See also *DeGregory* v. *Attorney General of New Hampshire,* 383 U. S. 825; *NAACP* v. *Alabama,* 357 U. S. 449; *Sweezy, supra; Watkins, supra.*

Thus, when an investigation impinges on First Amendment rights, the government must not only show that

the inquiry is of "compelling and overriding importance" but it must also "convincingly" demonstrate that the investigation is "substantially related" to the information sought.

Governmental officials must, therefore, demonstrate that the information sought is *clearly* relevant to a *precisely* defined subject of governmental inquiry. *Watkins, supra; Sweezy, supra.*[26] They must demonstrate that it is reasonable to think the witness in question has that information. *Sweezy, supra; Gibson, supra.*[27] And they must show that there is not any means of obtaining the information less destructive of First Amendment liberties. *Shelton* v. *Tucker,* 364 U. S., at 488; *Louisiana ex rel. Gremillion* v. *NAACP,* 366 U. S. 293, 296–297.[28]

These requirements, which we have recognized in decisions involving legislative and executive investigations, serve established policies reflected in numerous First

---

[26] As we said in *Watkins* v. *United States,* 354 U. S. 178,

"[W]hen First Amendment rights are threatened, the delegation of power to the [legislative] committee must be clearly revealed in its charter." "It is the responsibility of the Congress . . . to insure that compulsory process is used only in furtherance of a legislative purpose. That requires that the instructions to an investigating committee spell out the group's jurisdiction and purpose with sufficient particularity. . . . The more vague the committee's charter is, the greater becomes the possibility that the committee's specific actions are not in conformity with the will of the parent House of Congress." *Id.,* at 198, 201.

[27] We noted in *Sweezy* v. *New Hampshire,* 354 U. S. 234:

"The State Supreme Court itself recognized that there was a weakness in its conclusion that the menace of forcible overthrow of the government justified sacrificing constitutional rights. There was a missing link in the chain of reasoning. The syllogism was not complete. *There was nothing to connect the questioning of petitioner with this fundamental interest of the State." Id.,* at 251 (emphasis supplied).

[28] See generally Note, Less Drastic Means and the First Amendment, 78 Yale L. J. 464 (1969).

Amendment decisions arising in other contexts. The requirements militate against vague investigations that, like vague laws, create uncertainty and needlessly discourage First Amendment activity.[29] They also insure that a legitimate governmental purpose will not be pursued by means that "broadly stifle fundamental personal liberties when the end can be more narrowly achieved." *Shelton, supra,* at 488.[30] As we said in *Gibson, supra,* "Of course, a legislative investigation—as any investigation—must proceed 'step by step,' . . . but step by step or in totality, an adequate foundation for inquiry must be laid before proceeding in such a manner as will substantially intrude upon and severely curtail or inhibit constitutionally protected activities or seriously interfere with similarly protected associational rights." 372 U. S., at 557.

I believe the safeguards developed in our decisions involving governmental investigations must apply to the grand jury inquiries in these cases. Surely the function of the grand jury to aid in the enforcement of the law is no more important than the function of the legislature, and its committees, to make the law. We have long recognized the value of the role played by legislative investigations, see, *e. g., United States* v. *Rumely,*

---

[29] See *Watkins, supra,* at 208–209. See generally *Baggett* v. *Bullitt,* 377 U. S. 360, 372; *Speiser* v. *Randall,* 357 U. S. 513, 526; *Ashton* v. *Kentucky,* 384 U. S. 195, 200–201; *Dombrowski* v. *Pfister,* 380 U. S. 479, 486; *Smith* v. *California,* 361 U. S., at 150–152; *Winters* v. *New York,* 333 U. S. 507; *Stromberg* v. *California,* 283 U. S., at 369. See also Note, The Chilling Effect in Constitutional Law, 69 Col. L. Rev. 808 (1969).

[30] See generally *Zwickler* v. *Koota,* 389 U. S. 241, 249–250, and cases cited therein; *Coates* v. *Cincinnati,* 402 U. S. 611, 616; *Cantwell* v. *Connecticut,* 310 U. S. 296, 307; *De Jonge* v. *Oregon,* 299 U. S., at 364–365; *Schneider* v. *State,* 308 U. S. 147, 164; *Cox* v. *Louisiana,* 379 U. S. 559, 562–564. Cf. *NAACP* v. *Button,* 371 U. S. 415, 438. See also Note, The First Amendment Overbreadth Doctrine, 83 Harv. L. Rev. 844 (1970).

345 U. S. 41, 43; *Barenblatt* v. *United States,* 360 U. S. 109, 111–112, for the "power of the Congress to conduct investigations is inherent . . . [encompassing] surveys of defects in our social, economic or political system for the purpose of enabling the Congress to remedy them." *Watkins, supra,* at 187. Similarly, the associational rights of private individuals, which have been the prime focus of our First Amendment decisions in the investigative sphere, are hardly more important than the First Amendment rights of mass circulation newspapers and electronic media to disseminate ideas and information, and of the general public to receive them. Moreover, the vices of vagueness and overbreadth that legislative investigations may manifest are also exhibited by grand jury inquiries, since grand jury investigations are not limited in scope to specific criminal acts, see, *e. g., Wilson* v. *United States,* 221 U. S. 361, *Hendricks* v. *United States,* 223 U. S. 178, 184, *United States* v. *Johnson,* 319 U. S. 503, and since standards of materiality and relevance are greatly relaxed. *Holt* v. *United States,* 218 U. S. 245; *Costello* v. *United States,* 350 U. S. 359. See generally Note, The Grand Jury as an Investigatory Body, 74 Harv. L. Rev. 590, 591–592 (1961).[31] For, as the United States notes in its brief in *Caldwell,* the

---

[31] In addition, witnesses customarily are not allowed to object to questions on the grounds of materiality or relevance, since the scope of the grand jury inquiry is deemed to be of no concern to the witness. *Carter* v. *United States,* 417 F. 2d 384, cert. denied, 399 U. S. 935. Nor is counsel permitted to be present to aid a witness. See *In re Groban,* 352 U. S. 330.

See generally Younger, The Grand Jury Under Attack, pt. 3, 46 J. Crim. L. C. & P. S. 214 (1955); Recent Cases, 104 U. Pa. L. Rev. 429 (1955); Watts, Grand Jury: Sleeping Watchdog or Expensive Antique, 37 N. C. L. Rev. 290 (1959); Whyte, Is the Grand Jury Necessary?, 45 Va. L. Rev. 461 (1959); Note, 2 Col. J. Law & Soc. Prob. 47, 58 (1966); Antell, The Modern Grand Jury: Benighted Supergovernment, 51 A. B. A. J. 153 (1965); Orfield, The Federal Grand Jury, 22 F. R. D. 343.

grand jury "need establish no factual basis for commencing an investigation, and can pursue rumors which further investigation may prove groundless."

Accordingly, when a reporter is asked to appear before a grand jury and reveal confidences, I would hold that the government must (1) show that there is probable cause to believe that the newsman has information that is clearly relevant to a specific probable violation of law; [32] (2) demonstrate that the information sought cannot be obtained by alternative means less destructive of First Amendment rights; and (3) demonstrate a compelling and overriding interest in the information.[33]

This is not to say that a grand jury could not issue a subpoena until such a showing were made, and it is not to say that a newsman would be in any way privileged to ignore any subpoena that was issued. Obviously, before the government's burden to make such a showing were triggered, the reporter would have to move to quash the subpoena, asserting the basis on which he considered the particular relationship a confidential one.

---

[32] The standard of proof employed by most grand juries, federal and State, is simply "probable cause" to believe that the accused has committed a crime. See Note, 1963 Wash. U. L. Q. 102; L. Hall et al., Modern Criminal Procedure 793–794 (1969). Generally speaking, it is extremely difficult to challenge indictments on the ground that they are not supported by adequate or competent evidence. Cf. *Costello* v. *United States*, 350 U. S. 359; *Beck* v. *Washington*, 369 U. S. 541.

[33] Cf. *Garland* v. *Torre*, 259 F. 2d 545. The Court of Appeals for the Second Circuit declined to provide a testimonial privilege to a newsman called to testify at a civil trial. But the court recognized a newsman's First Amendment right to a confidential relationship with his source and concluded: "It is to be noted that we are not dealing here with the use of the judicial process to force a wholesale disclosure of a newspaper's confidential sources of news, nor with a case where the identity of the news source is of doubtful relevance or materiality. . . . The question asked . . . went to the heart of the plaintiff's claim." *Id.*, at 549–550 (citations omitted).

## B

The crux of the Court's rejection of any newsman's privilege is its observation that only "where news sources themselves are implicated in crime or possess information *relevant* to the grand jury's task need they or the reporter be concerned about grand jury subpoenas." See *ante,* at 691 (emphasis supplied). But this is a most misleading construct. For it is obviously not true that the only persons about whom reporters will be forced to testify will be those "confidential informants involved in actual criminal conduct" and those having "information suggesting illegal conduct by others." See *ante,* at 691, 693. As noted above, given the grand jury's extraordinarily broad investigative powers and the weak standards of relevance and materiality that apply during such inquiries, reporters, if they have no testimonial privilege, will be called to give information about informants who have neither committed crimes nor have information about crime. It is to avoid deterrence of such sources and thus to prevent needless injury to First Amendment values that I think the government must be required to show probable cause that the newsman has information that is clearly relevant to a specific probable violation of criminal law.[34]

---

[34] If this requirement is not met, then the government will basically be allowed to undertake a "fishing expedition" at the expense of the press. Such general, exploratory investigations will be most damaging to confidential news-gathering relationships, since they will create great uncertainty in both reporters and their sources. The Court sanctions such explorations, by refusing to apply a meaningful "probable cause" requirement. See *ante,* at 701–702. As the Court states, a grand jury investigation "may be triggered by tips, rumors, evidence proffered by the prosecutor, or the personal knowledge of the grand jurors." *Ante,* at 701. It thereby invites government to try to annex the press as an investigative arm, since any time government wants to probe the relationships between the

Similarly, a reporter may have information from a confidential source that is "related" to the commission of crime, but the government may be able to obtain an indictment or otherwise achieve its purposes by subpoenaing persons other than the reporter. It is an obvious but important truism that when government aims have been fully served, there can be no legitimate reason to disrupt a confidential relationship between a reporter and his source. To do so would not aid the administration of justice and would only impair the flow of information to the public. Thus, it is to avoid deterrence of such sources that I think the government must show that there are no alternative means for the grand jury to obtain the information sought.

Both the "probable cause" and "alternative means" requirements would thus serve the vital function of mediating between the public interest in the administration of justice and the constitutional protection of the full flow of information. These requirements would avoid a direct conflict between these competing concerns, and they would generally provide adequate protection for newsmen. See Part III, *infra*.[35] No doubt the courts would be required to make some delicate judgments in working out this accommodation. But that, after all,

---

newsman and his source, it can, on virtually any pretext, convene a grand jury and compel the journalist to testify.

The Court fails to recognize that under the guise of "investigating crime" vindictive prosecutors can, using the broad powers of the grand jury which are, in effect, immune from judicial supervision, explore the newsman's sources at will, with no serious law enforcement purpose. The secrecy of grand jury proceedings affords little consolation to a news source; the prosecutor obviously will, in most cases, have knowledge of testimony given by grand jury witnesses.

[35] We need not, therefore, reach the question of whether government's interest in these cases is "overriding and compelling." I do not, however, believe, as the Court does, that *all* grand jury investigations automatically would override the newsman's testimonial privilege.

is the function of courts of law. Better such judgments, however difficult, than the simplistic and stultifying absolutism adopted by the Court in denying any force to the First Amendment in these cases.[36]

The error in the Court's absolute rejection of First Amendment interests in these cases seems to me to be most profound. For in the name of advancing the administration of justice, the Court's decision, I think, will only impair the achievement of that goal. People entrusted with law enforcement responsibility, no less than private citizens, need general information relating to controversial social problems. Obviously, press reports have great value to government, even when the newsman cannot be compelled to testify before a grand jury. The sad paradox of the Court's position is that when a grand jury may exercise an unbridled subpoena power, and sources involved in sensitive matters become fearful of disclosing information, the newsman will not only cease to be a useful grand jury witness; he will cease to investigate and publish information about issues of public import. I cannot subscribe to such an anomalous result, for, in my view, the interests protected by the First Amendment are not antagonistic to the administration of justice. Rather, they can, in the long run, only be complementary, and for that reason must be given great "breathing space." *NAACP* v. *Button,* 371 U. S., at 433.

### III

In deciding what protection should be given to information a reporter receives in confidence from a news source, the Court of Appeals for the Ninth Circuit affirmed the holding of the District Court that the grand

---

[36] The disclaimers in MR. JUSTICE POWELL's concurring opinion leave room for the hope that in some future case the Court may take a less absolute position in this area.

jury power of testimonial compulsion must not be exercised in a manner likely to impair First Amendment interests "until there has been a clear showing of a compelling and overriding national interest that cannot be served by any alternative means." *Caldwell* v. *United States,* 434 F. 2d 1081, 1086. It approved the request of respondent Caldwell for specification by the government of the "subject, direction or scope of the Grand Jury inquiry." *Id.,* at 1085. And it held that in the circumstances of this case Caldwell need not divulge confidential information.

I think this decision was correct. On the record before us the United States has not met the burden that I think the appropriate newsman's privilege should require.

In affidavits before the District Court, the United States said it was investigating possible violations of 18 U. S. C. § 871 (threats against the President), 18 U. S. C. § 1751 (assassination, attempts to assassinate, conspiracy to assassinate the President), 18 U. S. C. § 231 (civil disorders), 18 U. S. C. § 2101 (interstate travel to incite a riot), 18 U. S. C. § 1341 (mail fraud and swindles) and other crimes that were not specified. But, with one exception, there has been no factual showing in this case of the probable commission of, or of attempts to commit, any crimes.[37] The single exception relates to the allegation that a Black Panther Party leader, David Hilliard, violated 18 U. S. C. § 871 during the course of a speech in November 1969. But Caldwell was subpoenaed two months after an indictment was returned against Hilliard, and that charge could not, subsequent to the indictment, be investigated by a grand jury. See *In re National Window Glass Workers,* 287 F. 219; *United*

---

[37] See Blasi 61 *et seq.*

*States* v. *Dardi,* 330 F. 2d 316, 336.[38] Furthermore, the record before us does not show that Caldwell probably had any information about the violation of any other federal criminal laws,[39] or that alternative

---

[38] After Caldwell was first subpoenaed to appear before the grand jury, the Government did undertake, by affidavits, to "set forth facts indicating the general nature of the grand jury's investigation [and] witness Earl Caldwell's possession of information relevant to this general inquiry." In detailing the basis for the belief that a crime had probably been committed, the Government simply asserted that certain actions had previously been taken *by other grand juries, and by Government counsel,* with respect to certain members of the Black Panther Party (*i. e.,* immunity grants for certain Black Panthers were sought; the Government moved to compel party members to testify before grand juries; and contempt citations were sought when party members refused to testify). No facts were asserted suggesting the actual commission of crime. The exception, as noted, involved David Hilliard's speech and its republication in the party newspaper, the Black Panther, for which Hilliard had been indicted before Caldwell was subpoenaed.

[39] In its affidavits, the Government placed primary reliance on certain articles published by Caldwell in the New York Times during 1969 (on June 15, July 20, July 22, July 27, and Dec. 14). On Dec. 14, 1969, Caldwell wrote:

" 'We are special,' Mr. Hilliard said recently 'We advocate the very direct overthrow of the Government by way of force and violence. By picking up guns and moving against it because we recognize it as being oppressive and in recognizing that we know that the only solution to it is armed struggle.'

"In their role as the vanguard in a revolutionary struggle, the Panthers have picked up guns.

"Last week two of their leaders were killed during the police raid on one of their offices in Chicago. And in Los Angeles a few days earlier, three officers and three Panthers were wounded in a similar shooting incident. In these and in some other raids, the police have found caches of weapons, including high-powered rifles." App. in No. 70–57, p. 13.

In my view, this should be read as indicating that Caldwell had interviewed Panther leaders. It does not indicate that he *probably* had knowledge of the crimes being investigated by the Government. And, to repeat, to the extent it does relate to Hilliard's threat, an

means of obtaining the desired information were pursued.[40]

In the *Caldwell* case, the Court of Appeals further found that Caldwell's confidential relationship with the leaders of the Black Panther Party would be impaired if he appeared before the grand jury at all to answer questions, even though not privileged. *Caldwell* v. *United States*, 434 F. 2d, at 1088. On the particular facts before it,[41] the court concluded that the very

---

indictment had already been brought in that matter. The other articles merely demonstrate that Black Panther Party leaders had told Caldwell their ideological beliefs—beliefs that were readily available to the Government through other sources, like the party newspaper.

[40] The Government did not attempt to show that means less impinging upon First Amendment interests had been pursued.

[41] In an affidavit filed with the District Court, Caldwell stated:

"I began covering and writing articles about the Black Panthers almost from the time of their inception, and I myself found that in those first months . . . they were very brief and reluctant to discuss any substantive matter with me. However, as they realized I could be trusted and that my sole purpose was to collect my information and present it objectively in the newspaper and that I had no other motive, I found that not only were the party leaders available for in-depth interviews but also the rank and file members were cooperative in aiding me in the newspaper stories that I wanted to do. During the time that I have been covering the party, I have noticed other newspapermen representing legitimate organizations in the news media being turned away because they were not known and trusted by the party leadership.

"As a result of the relationship that I have developed, I have been able to write lengthy stories about the Panthers that have appeared in The New York Times and have been of such a nature that other reporters who have not known the Panthers have not been able to write. Many of these stories have appeared in up to 50 or 60 other newspapers around the country.

"The Black Panther Party's method of operation with regard to members of the press is significantly different from that of other organizations. For instance, press credentials are not recognized as being of any significance. In addition, interviews are not normally designated as being 'backgrounders' or 'off the record' or 'for

appearance by Caldwell before the grand jury would jeopardize his relationship with his sources, leading to a severance of the news-gathering relationship and impairment of the flow of news to the public: [42]

> "Appellant asserted in affidavit that there is nothing to which he could testify (beyond that which he has already made public and for which, therefore, his appearance is unnecessary) that is not protected by the District Court's order. If this is true—and the Government apparently has not believed it necessary to dispute it—appellant's response to the subpoena would be a barren perform-

---

publication' or 'on the record.' Because no substantive interviews are given until a relationship of trust and confidence is developed between the Black Panther Party members and a reporter, statements are rarely made to such reporters on an expressed 'on' or 'off' the record basis. Instead, an understanding is developed over a period of time between the Black Panther Party members and the reporter as to matters which the Black Panther Party wishes to disclose for publications and those matters which are given in confidence. . . . Indeed, if I am forced to appear in secret grand jury proceedings, my appearance alone would be interpreted by the Black Panthers and other dissident groups as a possible disclosure of confidences and trusts and would similarly destroy my effectiveness as a newspaperman."

The Government did not contradict this affidavit.

[42] "Militant groups might very understandably fear that, under the pressure of examination before a Grand Jury, the witness may fail to protect their confidences . . . . The Government characterizes this anticipated loss of communication as Black Panther reprisal . . . . But it is not an extortionate threat we face. It is human reaction as reasonable to expect as that a client will leave his lawyer when his confidence is shaken. . . . As the Government points out, loss of such a sensitive news source can also result from its reaction to indiscreet or unfavorable reporting or from a reporter's association with Government agents or persons disapproved of by the news source. Loss in such a case, however, results from an exercise of the choice and prerogative of a free press. It is not the result of Government compulsion." *Caldwell* v. *United States*, 434 F. 2d, at 1088.

ance—one of no benefit to the Grand Jury. To destroy appellant's capacity as news gatherer for such a return hardly makes sense. Since the cost to the public of excusing his attendance is so slight, it may be said that there is here no public interest of real substance in competition with the First Amendment freedoms that are jeopardized.

"If any competing public interest is ever to arise in a case such as this (where First Amendment liberties are threatened by mere appearance at a Grand Jury investigation) it will be on an occasion in which the witness, armed with his privilege, can still serve a useful purpose before the Grand Jury. Considering the scope of the privilege embodied in the protective order, these occasions would seem to be unusual. It is not asking too much of the Government to show that such an occasion is presented here." *Id.*, at 1089.

I think this ruling was also correct in light of the particularized circumstances of the *Caldwell* case. Obviously, only in very rare circumstances would a confidential relationship between a reporter and his source be so sensitive that mere appearance before the grand jury by the newsman would substantially impair his newsgathering function. But in this case, the reporter made out a prima facie case that the flow of news to the public would be curtailed. And he stated, without contradiction, that the only nonconfidential material about which he could testify was already printed in his newspaper articles.[43] Since the United States has not attempted to

[43] Caldwell stated in his affidavit filed with the District Court, see n. 40, *supra:*

"It would be virtually impossible for me to recall whether any particular matter disclosed to me by members of the Black Panther Party since January 1, 1969, was based on an understanding that it would or would not be confidential. Generally, those matters which were made on a nonconfidential or 'for publication' basis have been

refute this assertion, the appearance of Caldwell would, on these facts, indeed be a "barren performance." But *this* aspect of the *Caldwell* judgment I would confine to its own facts. As the Court of Appeals appropriately observed: "[T]he rule of this case is a narrow one. . . ." *Caldwell, supra,* at 1090.

Accordingly, I would affirm the judgment of the Court of Appeals in No. 70–57, *United States* v. *Caldwell*.[44] In the other two cases before us, No. 70–85, *Branzburg* v. *Hayes* and *Meigs,* and No. 70–94, *In re Pappas,* I would vacate the judgments and remand the cases for further proceedings not inconsistent with the views I have expressed in this opinion.

---

published in articles I have written in The New York Times; conversely, any matters which I have not thus far disclosed in published articles would have been given to me based on the understanding that they were confidential and would not be published."

[44] The District Court reserved jurisdiction to modify its order on a showing of a governmental interest which cannot be served by means other than Caldwell's grand jury testimony. The Government would thus have further opportunity in that court to meet the burden that, I think, protection of First Amendment rights requires.